2015 IL App (1st) 130837

No. 1-13-0837

Fifth Division
June 26, 2015

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 10 CR 2330 |
| v. | ) ) | The Honorable |
| RYISHIE ROBINSON, | ) ) | Angela M. Petrone, Judge Presiding. |
| Defendant-Appellant. | ) ) | |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Palmer and Justice Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1     On January 14, 2010, defendant was arrested after being discovered by Eugene Witherspoon in Witherspoon's apartment attempting to remove a flat screen television set. After a bench trial, defendant was convicted of residential burglary and aggravated battery of Witherspoon. 720 ILCS 5/19-3(a), 12-4(a) (West 2008). Defendant filed a *pro se* posttrial motion for a new trial claiming ineffective assistance of counsel, which was denied. Defense counsel filed a posttrial motion for a new trial with numerous claims, which was also denied.

After hearing arguments on aggravation and mitigation, defendant was sentenced to 30 years with the Illinois Department of Corrections (IDOC) for residential burglary and 7 years for aggravated battery, to run concurrently. This direct appeal followed.

¶ 2        On appeal, defendant claims that: (1) the State presented insufficient evidence to prove defendant guilty of residential burglary and aggravated battery beyond a reasonable doubt; (2) defendant was denied effective assistance of counsel at the hearing on his *pro se* posttrial motion; (3) the trial court sentenced defendant to an excessive 30-year sentence by finding that Witherspoon's speech impediment was the result of the injury suffered in the incident; (4) the trial court erred in sentencing defendant to a 7-year extended sentence for aggravated battery because it was the lesser offense of the offenses he was found guilty of; and (5) the fines and fees were incorrectly calculated. The State agrees that the fines and fees order should be modified, and the "Order Assessing Fines, Fees, and Costs" is corrected as follows: the $5 electronic citation fee is removed, the defendant is credited $5 per day for the 1,104 days defendant was incarcerated awaiting trial, and this credit is applied to the $50 in fines due from defendant. Thus, the total fees and costs due from defendant is adjusted to $365. The mittimus is corrected accordingly.

¶ 3        For the following reasons, we do not find persuasive defendant's claims: (1) that the State's evidence was insufficient to prove residential burglary and aggravated battery; and (2) that the sentence for residential burglary was excessive. However, defendant is correct that he engaged in a single course of action when a security guard blocked defendant's only escape path and defendant bit off a portion of his lip. Thus, the extended-term sentence on the lesser offense of aggravated battery was inappropriate and we correct the mittimus to reflect a five-year sentence for that offense. In addition, we remand for a *Krankel* hearing

before a different judge, as required by our supreme court's seminal decision in *People v. Jolly*, 2014 IL 117142, ¶ 46.

¶ 4                                                    BACKGROUND

¶ 5          We provide a detailed description of testimony below, but in sum, the State's evidence at trial established that, on January 14, 2010, Eugene Witherspoon, a security guard and resident of an apartment building located on East 46th Street in Chicago, was outside talking to a number of employees from a security company about installing security cameras in the building. His wife, Mary Johnson, was asleep in their second-floor apartment. While outside discussing the installation of security cameras, Witherspoon heard a noise from inside the building and ran to the third floor, where he believed the noise originated. He then descended to the second floor, where he observed a woman exiting his apartment with his laptop. Rather than follow this woman, Witherspoon entered his apartment to check on his wife and observed defendant in his apartment wrapping an unplugged television cord around Witherspoon's television set. While defendant and Witherspoon testified to differing versions of the events that followed, it is undisputed that a physical altercation between defendant and Witherspoon ensued and that during this altercation, defendant bit off Witherspoon's lower lip.

¶ 6                                             I. Evidence at Trial

¶ 7          The State's evidence at trial consisted of the testimony of four witnesses: (1) Eugene Witherspoon, the victim; (2) Mary Johnson, Eugene Witherspoon's wife, who was asleep in the apartment at the time of the incident; (3) police officer John Thill, the arresting officer; and (4) police officer Thomas Ellerbeck, one of the evidence technicians who processed the

crime scene. The parties also stipulated to the testimony of Michael Cox, the Illinois State Police crime lab fingerprint examiner who reviewed fingerprints from the crime scene.

¶ 8        The parties stipulated that Michael Cox, a senior fingerprint examiner for the Illinois State Police crime lab, would testify that in Cox's opinion one of the two latent prints recovered at the crime scene belonged to defendant within a reasonable degree of scientific certainty. It was further stipulated that no other prints suitable for comparison were recovered from the other items submitted into evidence.

¶ 9        Eugene Witherspoon, age 39,[1] testified that, on January 14, 2010, he was working as a security guard in an apartment building on East 46th Street in Chicago, Illinois. He also lived in a duplex unit in the building with his wife, Mary Johnson. Witherspoon's duplex unit was on the second and third floors of the apartment building. On January 14, 2010, his wife was suffering from a migraine headache, had taken some medicine for her migraine, and was asleep in one of the upstairs bedrooms of the couple's apartment. At 2 p.m., Witherspoon received a telephone call from several employees of a security company who were present at the building to determine locations for new security cameras. Witherspoon locked his apartment door and went outside the building to meet with the security camera personnel. Witherspoon testified that the front door of the building was locked because the door locked automatically.

¶ 10       Witherspoon was outside for 30 minutes when he heard a noise from inside his section of the building which, due to remodeling, was occupied at the time by only Witherspoon and his wife. Witherspoon ran to the third floor, where he believed the noise originated. Not finding anything on the third floor, Witherspoon walked down the stairs to

_____

[1] All ages of witnesses reflect their age on January 14, 2010, the day of the offense.

the second floor, where he observed a young woman, whom Witherspoon did not recognize, leaving Witherspoon's apartment. The unidentified woman was carrying a bag with a laptop protruding from it that Witherspoon recognized as his own personal laptop. The woman ran down the stairs when she observed Witherspoon. Observing that his apartment door was ajar, Witherspoon chose to enter his apartment instead of chasing the woman in the hallway.

¶ 11     Upon entering his apartment, Witherspoon encountered defendant, who was standing above Witherspoon's flat screen television set and was wrapping the unplugged television cord around the television set. The television had been moved from its usual stand and onto the floor. When defendant observed Witherspoon he ran at Witherspoon, who was blocking the doorway, and a fight ensued. Defendant and Witherspoon fought in Witherspoon's apartment for between 5 and 10 minutes before the fight moved to the apartment's hallway and then down the apartment's stairs. During the encounter, Witherspoon tried to dial 911 on his cell phone and tried to shout to his wife for help, but Witherspoon was unable to dial the phone and Witherspoon's wife did not respond to his shouts. After the fight moved into the hallway, defendant bit Witherspoon's lower lip off. This caused Witherspoon tremendous pain and made him dizzy and nauseous. After defendant bit Witherspoon's lip, Witherspoon drew his handgun, which he was licensed to carry, and hit defendant with the gun once on the top of the head, at which point the pistol fired and shattered the glass doorway to the building. Following the gunshot, several individuals entered the building, Witherspoon informed them that his apartment had been burglarized by defendant, and these unidentified individuals detained defendant until the police arrived. Witherspoon was transported to two separate hospitals, where his lip was reattached. Witherspoon suffered immense pain from the surgeries, and his lip would occasionally turn white and the skin on his lip would peel.

5

¶ 12            Witherspoon also testified that a hat, jacket, glove, cell phone, cigarette butt, pocket knife, and flathead screwdriver discovered in the hallway of the building were not his. Witherspoon further testified that the scratch marks found on his door had not previously been there. The State showed Witherspoon People's exhibit No. 14, a photograph of Witherspoon's apartment, and Witherspoon marked an "X" where he and defendant fought. This exhibit was later admitted into evidence without objection.

¶ 13            During cross-examination, defense attempted to impeach Witherspoon's testimony that there were only two people inside his apartment, noting Witherspoon's testimony at a preliminary hearing that there were three people inside his "residence": defendant, the woman, and a "lookout guy." The State objected and the trial court sustained the objection, noting: "The only reason I'm sustaining the objection is the residence might be interpreted to mean the entire building." Upon further questioning, Witherspoon clarified that there were three people "at" his "residence": defendant and the woman in Witherspoon's apartment and a male "lookout" standing immediately outside of the building.

¶ 14            Witherspoon also testified on cross-examination that when he entered the apartment he was standing between defendant and the doorway, and there was no other clear path between defendant and the apartment's exit. Witherspoon also testified that before using his gun to hit defendant, Witherspoon observed defendant reaching for something, and this was what prompted Witherspoon to draw his gun. Witherspoon testified on cross-examination that he had used his gun to hit defendant "once or twice." Witherspoon further testified that at the time of the incident his height was "six-seven" and he weighed 240 pounds. Witherspoon

acknowledged that he was "quite a bit taller" than defendant.[2] Witherspoon also confirmed that there was a coffee table with various items on it and a plugged-in heater immediately outside the area in Witherspoon's apartment where Witherspoon fought defendant. However, nothing in the apartment was knocked over during the fight between him and defendant.

¶ 15    Mary Johnson, age 42, testified that, on January 14, 2010, she left her school,[3] where she was a student, at noon because she was suffering from a migraine. Johnson arrived around 1 p.m. to her and Witherspoon's apartment on East 46th Street. She took two Excedrin Migraine pills and went to sleep in the upstairs bedroom. She slept through the altercation between Witherspoon and defendant and only woke when a Chicago police officer called to her after arriving at the scene. She stated that a hat, jacket, glove, cell phone, cigarette butt, pocket knife, and flathead screwdriver discovered in the hallway of the building did not belong to her or Witherspoon and that these items had not been present when she came home. Johnson confirmed that the television set had been moved and the laptop that was taken from the apartment belonged to her and Witherspoon. Johnson further testified that the buzzer system to the apartment building did not work. On cross-examination, Johnson confirmed that no items in the apartment had been knocked over or were out of place, besides the television and missing laptop.

¶ 16    Police officer John Thill testified that, on January 14, 2010, he responded to a call to East 46th Street concerning an altercation. Two individuals in a vehicle parked outside the building pointed the officer to the building. These two individuals left after Officer Thill entered the building. Officer Thill observed Witherspoon and defendant both appearing

---

[2] Defendant's criminal history report lists defendant as having a height of 5 feet 4 inches and weighing 160 pounds.

[3] The record does not disclose what type of school Mary Johnson was attending on January 14, 2010.

"exhausted" and Witherspoon had blood on his face. Officer Thill attempted to interview defendant, who was "verbally elusive." After Officer Thill talked to Witherspoon, he placed defendant in handcuffs in order to prevent defendant from leaving the scene and called an ambulance for Witherspoon. Officer Thill noticed that the door to Witherspoon's apartment appeared to have multiple pry marks on it. Officer Thill arrested defendant and gave defendant a pat-down search before bringing defendant to the police station, but he did not discover anything noticeable. However, a more thorough search at the police station recovered a Phillips-head screwdriver in defendant's pocket.

¶ 17        Police officer Thomas Ellerbeck, an evidence technician, testified that, on January 14, 2010, he responded to a call to proceed to Provident Hospital to take photographs of Witherspoon. After Officer Ellerbeck took photographs of Witherspoon and Witherspoon's injuries, Officer Ellerbeck went to Witherspoon's apartment building, where he found a hat, jacket, glove, cell phone, cigarette butt, pocket knife, flathead screwdriver, and an expended cartridge case inside the building. He photographed these items and placed them into an evidence bag. Officer Ellerbeck noticed the pry marks on Witherspoon's door and photographed them. Officer Ellerbeck then took two fingerprint lifts from the television set inside the apartment and submitted the lifts into an evidence bag. One of these lifts would later be identified as matching a fingerprint of defendant. On cross-examination, Officer Ellerbeck testified that he did not observe, nor did he photograph, any wood shavings on the floor near Witherspoon's door. Officer Ellerbeck also acknowledged that he took one photo showing a pocket knife and cell phone on a telephone book, with a piece of glass on the cell phone, and that the cell phone and pocket knife were removed and placed into evidence bags

before Officer Ellerbeck took another photo of the entryway where the cell phone and pocket knife had been located.

¶ 18    The State then rested, and the trial court denied defendant's motion for a directed finding. Defendant then chose to testify on his own behalf. Defendant, age 36, testified that, on January 14, 2010, defendant was walking to work when he was approached by a woman he recognized as frequenting the restaurant where defendant worked, a woman defendant knew only as "Wanda." Wanda asked defendant to help her move and defendant, who had 45 minutes before he needed to be at work, agreed to help her. Defendant followed Wanda to an apartment building at East 46th Street where Wanda opened the door to an apartment and led defendant inside.

¶ 19    Inside, Wanda indicated that defendant should take the television set, which was already on the floor. The door to the apartment opened revealing Witherspoon who, upon observing defendant and Wanda, yelled "Wanda, what the f*** is you doing?" Wanda responded that she was retrieving her belongings and she began arguing with Witherspoon. Defendant moved into the hallway, unsure of what was happening. Wanda walked into the hallway of the building, telling defendant that she would have to retrieve her belongings at another time. Defendant began to follow Wanda down the stairs when Witherspoon hit defendant from behind several times in the head with a gun. Defendant and Witherspoon then began to wrestle, and at one point during this fight Witherspoon yanked defendant toward him and defendant bit Witherspoon's lip. After defendant bit Witherspoon's lip, Witherspoon released defendant, and Wanda and defendant started to leave. As Wanda held the door open for the defendant to leave, Witherspoon used his gun to shoot the front door of the building, shattering the glass in the door.

9

¶ 20    At this point, two men entered the building to inquire what was happening. Witherspoon told the men that defendant had tried to rob his apartment. The men calmed Witherspoon down, and defendant and Witherspoon sat in the hallway until police arrived. When the police arrived they questioned one of the men who was still in the hallway and this man informed the police officer that he was unsure of what had occurred. The police then transported defendant to the police station and then to Provident Hospital. At the hospital, defendant received eight staples in three different locations in the "top of the back" of his head.

¶ 21    On cross-examination defendant admitted that the jacket, hat, glove, cigarette butt, pocket knife, and cell phone located in the hallway of the building belonged to him. However, defendant denied owning the flathead screwdriver that was also found in the hallway and denied having the Phillps-head screwdriver in his pocket when transported to the police station. Defendant further testified that when he arrived at the apartment building Wanda opened the door to the building without a key and without needing to be buzzed into the building. While walking up the stairs of the building, defendant was "two or three stairs" behind Wanda and did not see if she used a key to open the door to the apartment, but the door was open and Wanda was entering the apartment when defendant reached the top of the stairs. Defendant also testified that he never observed a computer in the apartment and that Wanda did not have a bag or a computer when she left the apartment building.

¶ 22    During cross-examination, defendant did not acknowledge specifically meeting with an assistant State's Attorney (ASA), but did acknowledge that "a woman" tried to talk to him while defendant was at the police station. Defendant denied talking to this woman or to any other individual at the police station.

¶ 23          After cross-examination, the defense moved into evidence the medical records from Provident Hospital that detailed defendant's injuries. The State did not object and the trial court admitted the medical records into evidence.

¶ 24          On rebuttal the State read a stipulation that if a certain ASA were called to testify she would testify the following to be true:

> "THE STATE: If called to testify, Assistant State's Attorney *** would state that she is employed by the Cook County State's Attorney's office as an Assistant State's Attorney and was so employed on January 15, 2010, assigned to the Felony Review Unit of the Cook County State's Attorney's office.

> As part of her assignment, at approximately 1:50 a.m., she went to Chicago Police Department Area 1 Detective Division at 51st and Wentworth where she, in the presence of Detective Harper *** and Detective Filbin, *** interviewed the Defendant, whom she would identified [*sic*] in open court.

> Prior to her interview, she advised the Defendant of his *Miranda* rights and the Defendant waived each right. After waiving each *Miranda* right, the Defendant states in summary, the following:

> He ran into his friend Wanda on 47th street. Wanda asked the Defendant to help her get some of her things out of an apartment on 46th street. He and Wanda go to a building and get buzzed in. They try to go—I'm sorry, not the word try. They go to a second floor apartment and the front door is open. Defendant and Wanda go into the apartment and get a computer and Defendant starts wrapping—

> ***

11

THE COURT: You said they went to an apartment. She asked him to help her get her things out of the apartment at 46th street.

THE STATE: Correct.

THE COURT: Then I lost you after that. The Defendant and Wanda go to a building and get buzzed in. They go to a second floor apartment and the front door is open.

THE COURT: The front door is open or the front door is opened?

THE STATE: The front door is open. Defendant and Wanda go into the apartment and get a computer and the Defendant starts wrapping the flat screen. Defendant stated that the victim comes in and starts arguing with Wanda.

The Defendant states he thinks they used to date. The defendant states Mary Johnson comes down and sees what's going on, says nothing, and then goes back upstairs.

The Defendant states he and victim start fighting in the apartment and hallway. They fall down some stairs and the Defendant bites the victim's lip.

The Defendant states he starts to leave and the victim shoots at him. Defendant tried to leave the building by the front door but is then stopped by other people who come in and the police.

Defendant states Wanda probably called the police, but she was not there when the police arrived.

The Defendant states that he had the screwdriver because the night before, he was scraping grease off a barbecue pit and it must have still been in his pants. So stipulated?"

¶ 25    Defense counsel stated that he had spoken to the ASA and that the statement was consistent with what she would testify to if called as a witness. The trial court accepted the stipulation. The State then rested in rebuttal.

¶ 26                                    II. Conviction and Posttrial Motions

¶ 27    At the close of the bench trial on December 3, 2012, the trial court found that Witherspoon's and Johnson's testimony was credible and defendant's testimony was not. The trial court then found defendant guilty of: (1) residential burglary; (2) aggravated battery by great bodily harm; (3) aggravated battery by permanent disfigurement; and (4) home invasion. On January 4, 2013, defense counsel filed a posttrial motion for a new trial. On January 10, 2013, at the hearing on defense counsel's posttrial motion for a new trial, defendant stated that he was making a *pro se* motion for a new trial based on the ineffective assistance of his trial counsel. The notice of service for the *pro se* motion, the *pro se* motion itself, and defendant's affidavit in support of his motion had each been stamped "received" on January 4, 2012, but had not been filed. The trial court gave defendant leave to file the *pro se* motion, the notice of service, and the affidavit.

¶ 28    Defendant's *pro se* motion alleged ineffective assistance for: (1) failing to have meaningful conferences; (2) not conducting a proper investigation to find Wanda, who would have testified that she had a relationship with Witherspoon; (3) failing to interview the defense investigator, Jane Doe,[4] who previously interviewed Witherspoon; (4) failing to contact the medical doctor who treated defendant's wounds; (5) failing to investigate the crime scene; (6) failing to request the court to vacate the home invasion count; (7) failing to file pretrial motions to quash or suppress evidence; (8) failing to suppress the stipulation of

_____

[4] The investigator was later identified by defense counsel as having the last name "Stewart" but no first name was provided.

the ASA's statement; (9) failing to adequately cross-examine Witherspoon; (10) failing to adequately cross-examine Officer Ellerbeck, the evidence technician; and (11) failing to subpoena any of the arresting officers.

¶ 29     The trial court then questioned defendant about these claims. Defendant claimed the doctor who treated defendant could have impeached Witherspoon's testimony that Witherspoon hit defendant once, to which the court replied, "He said one to two times, but go ahead." Defendant did not have an affidavit from the doctor.

¶ 30     The court then asked defendant how defense counsel's investigation of the crime scene would have helped defendant beyond the photos of the apartment submitted into evidence. Defendant claimed that defense counsel would have been able to give the court "in the mind's eye" a better measurement of the distances in the apartment and the impossibility of the fight.

¶ 31     The court did not address the allegation of failing to vacate the home invasion count, stating that, because defense counsel had not made arguments yet in mitigation as to sentencing, the court would hold that allegation in abeyance.

¶ 32     The trial court asked defendant to clarify who the investigator, Jane Doe, was. Defendant was incapable of doing so, and defense counsel clarified that defendant was referring to an investigator, Ms. Stewart, used by defendant's previous public defender. Investigator Stewart had interviewed Witherspoon. The court then asked defendant how the testimony of the investigator would have helped defendant's case. Defendant could not remember the specifics from the investigator's interview, but claimed that it would have impeached Witherspoon's testimony that Witherspoon and Wanda did not engage in a verbal exchange. Defendant did not have an affidavit from Investigator Stewart.

14

¶ 33    The trial court then asked defendant if he had an affidavit from Wanda, which defendant did not have. Defendant claimed that Wanda would be able to verify that she invited defendant to the apartment, and that defense counsel should have tried to locate her because defendant had told defense counsel the area that Wanda frequented. Upon questioning by the court, defendant was not able to provide Wanda's last name, birthday, or address.

¶ 34    The court then asked defendant why he thought the screwdriver recovered by the police from defendant's pocket could have been suppressed. Defendant responded that it could have been challenged because the officer did not feel it during the pat-down at the crime scene but later recovered the screwdriver at the police station.

¶ 35    The court then asked defendant about his claim to suppress the statement the ASA. Defendant reiterated his claim that he never spoke to an assistant State's Attorney.

¶ 36    Defendant claimed that defense counsel failed to adequately question Witherspoon as to an alleged discrepancy about the number of people in the "apartment" versus the "residence." Defendant also claimed that defense counsel failed to adequately cross-examine Officer Ellerbeck about his photos of the evidence found at the crime scene. The trial court responded to both claims by observing that defense counsel had cross-examined the witnesses and raised the very same claims regarding credibility that defendant was now stating were not made.

¶ 37    After the trial court allowed defendant to explain his claims, the trial court asked defense counsel if he would like to respond. Defense counsel responded that he never received any information with which to find Wanda. Defense counsel stated that he vigorously cross-examined witnesses and that he asked defendant at trial if there were any

other questions defendant wanted him to ask, and he then asked the witnesses those questions that defendant requested him to ask. Defense counsel stated that he had visited the scene of the crime but was unable to enter the building, and that there was not anything defense counsel could do about that. Defense counsel stated that he did not call the doctor as a witness because there was nothing the doctor could add that was not already in the medical records. Further, defense counsel noted that, in closing arguments, he specifically pointed the court's attention to the page of the medical report showing that there were three separate lacerations on defendant's head. Defense counsel noted that he had raised at trial the concerns about Witherspoon's discrepancy as to the number of people at the apartment on January 14, 2010, and the potential problems with the photographs taken by Officer Ellerbeck. Defense counsel stated that he asked Stewart, the defense investigator, to be ready to be called as a witness but that there was nothing in the interview of Witherspoon obtained by Investigator Stewart that could have been used to impeach Witherspoon. Defense counsel stated that he stipulated only that the assistant State's Attorney's statement was what she would have testified to and that defense counsel had not stipulated to the truthfulness of the statement.

¶ 38        After defense counsel ended his reply, the trial court invited the State to respond. The State noted that defendant's allegations "fly in the face of everything that was done over this multi-day trial." The State argued that defense counsel would not have been able to suppress the screwdriver found on defendant's person "[b]ecause the officer said he did a patdown [*sic*] and didn't feel it and it was later recovered is not a basis, as Your Honor is well aware, of a motion to quash arrest or suppress evidence." In regard to the statement from the assistant State's Attorney, the State claimed that the statement and defendant's testimony were "generally the same" and that defendant wanting to suppress the testimony "when he

16

testified to those exact facts flies in the face of common sense." The State noted that Witherspoon's testimony would not have been impeached by Investigator Stewart's testimony. The State, citing relevant legal authority, then stated that the trial court is not required to appoint new counsel every time a defendant files a *pro se* motion claiming ineffective assistance of counsel and that the court can perform a factual finding either by asking the defendant questions about the claim or by basing the court's decision on the court's personal knowledge of defense counsel's performance at trial. The State then requested that the court deny defendant's posttrial motion for a new trial.

¶ 39        The court then denied defendant's motion. In doing so, the court noted that it had observed defense counsel asking defendant during trial if there were any more question to ask witnesses. Defense counsel had then directed defendant's questions to the witnesses. Defense counsel had further "hit the points that should have been hit for your defense." As to Wanda, the court noted defense counsel did not have enough information to find her and there was no proof that she would have corroborated defendant's story. The court finished by noting that none of defendant's claims would have affected the outcome at trial. The trial court denied both posttrial motions.

¶ 40                                    III. Sentencing

¶ 41        On January 22, 2013, the trial court sentenced defendant. First, the court vacated the conviction of home invasion, stating: "And I did review my notes about your arguments, Counsel, about the fact that [defendant] was trying to leave but was stopped by Mr. Witherspoon. So I am going to revisit that issue and vacate my finding of Count 1, the home invasion, based on my reading of that ruling." During the aggravation phase of sentencing, the trial court considered defendant's burglary conviction on September 23, 2003, and

defendant's eight burglary convictions on October 13, 2006. On January 14, 2010, the date of the offense, defendant was still on mandatory supervised release for eight burglary convictions from October 13, 2006. All nine prior convictions were Class 2 offenses; as a result of the prior convictions, and the violent nature of the residential burglary, defendant was sentenced as a Class X offender. Defendant stated that he had reviewed the pre-sentencing investigation report and the defense did not object to the prior convictions. The trial court also considered that defendant caused serious bodily harm to Witherspoon and that the trial court had observed at trial how this bodily harm caused Witherspoon to suffer a speech impediment. Furthermore, the injury caused Witherspoon severe pain and Witherspoon's lip would, on occasion, become discolored and peel. In mitigation, defense counsel stated that defendant's mother had died at a young age, that defendant's father was not involved in his life and that, as a result, defendant had to take care of himself from a young age. Defense also noted that defendant had been employed for the past 10 years.

¶ 42    On the count of residential burglary, the trial court sentenced defendant to 30 years in IDOC, followed by 3 years of mandatory supervised release. On the count of aggravated battery by great bodily harm, the trial court sentenced defendant to a seven-year extended term sentence, to run concurrently.[5] On the same day, the trial court denied defendant's motion to reconsider sentence. The trial court granted defendant credit of $5 per day for the 1,104 days defendant was in custody. The trial court calculated the fines and fees as totaling $445 and stated "I will give you credit of $5 a day toward each day you serve [*sic*] toward those fines." This direct appeal followed.

---

[5] The trial court did not state that it was merging the count of aggravated battery by permanent disfigurement into the count of aggravated battery by great bodily harm. However, the mittimus reflects only convictions and sentences for residential burglary and aggravated battery by great bodily harm.

¶ 43                                              ANALYSIS

¶ 44          On appeal, defendant claims that: (1) the State presented insufficient evidence to prove defendant guilty of residential burglary and aggravated battery beyond a reasonable doubt; (2) defendant was denied effective assistance of counsel at the hearing on his *pro se* posttrial motion; (3) the trial court sentenced defendant to an excessive 30-year sentence by finding that Witherspoon's speech impediment was the result of the injury suffered in the incident; and (4) the trial court erred in sentencing defendant to a 7-year extended sentence for aggravated battery because it was the lesser offense of the offenses he was found guilty of.

¶ 45          For the following reasons, we do not find persuasive defendant's claims: (1) that the State's evidence was insufficient to prove residential burglary and aggravated battery; and (2) that the sentence for residential burglary was excessive. However, defendant is correct that he engaged in a single course of action when a security guard blocked defendant's only escape path and defendant bit off a portion of his lip. Thus, the extended-term sentence on the lesser offense of aggravated battery was inappropriate and we correct the mittimus to reflect a five-year sentence on that offense. We also correct the "Order Assessing Fines, Fees, and Costs" to reflect that the fines and fees total $365.  In addition, we remand for a new *Krankel* hearing before a different judge, as required by our supreme court's decision in *People v. Jolly*, 2014 IL 117142, ¶ 46.

¶ 46                                    I. Sufficiency of the Evidence

¶ 47                                       A. Elements of Offenses

¶ 48          To prove residential burglary, the State must prove beyond a reasonable doubt that defendant: (1) knowingly and without authority entered or knowingly and without authority

19

remained within the dwelling place of another; and (2) intended to commit therein a felony or theft. 720 ILCS 5/19-3(a) (West 2008); *People v. Maggette*, 195 Ill. 2d 336, 353 (2001). " 'The offense is complete upon entering with the requisite intent. The actual commission of the intended offense is irrelevant.' " *Maggette,* 195 Ill. 2d at 353 (quoting *People v. Palmer*, 83 Ill. App. 3d 732, 734 (1980)).

¶ 49    To prove aggravated battery, the State must prove beyond a reasonable doubt that defendant: (1) in committing the battery caused great bodily harm to Eugene Witherspoon; and (2) did so intentionally. 720 ILCS 5/12-4(a) (West 2008); *People v. Totten*, 118 Ill. 2d 124, 138 (1987).

¶ 50                                    B. Standard of Review

¶ 51    "When reviewing a challenge to the sufficiency of the evidence, this court considers whether, viewing the evidence in the light most favorable to the State, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (Emphasis omitted and internal quotation marks omitted.) *People v. Belknap*, 2014 IL 117094, ¶ 67 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, (1979)); see also *People v. Collins*, 106 Ill. 2d 237, 261 (1985); *People v. Smith*, 185 Ill. 2d 532, 541, (1999). "[I]n a bench trial it is for the trial judge, sitting as the trier of fact, to determine the credibility of the witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009); see also *People v. McDonald*, 168 Ill. 2d 420, 448-49 (1995); *People v. Belknap*, 2014 IL 117094, ¶ 67; *People v. Wittenmyer*, 151 Ill. 2d 175, 191-92 (1992); *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 52    A reviewing court must review the record while giving due consideration to the fact that the trial judge observed and heard the witnesses. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004); *Smith,* 185 Ill. 2d at 541. A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. *Smith,* 185 Ill. 2d at 542; see also *People v. Glover*, 49 Ill. 2d 78, 84-85, (1971).

¶ 53    With these overarching principles in mind, we turn to defendant's claims.

¶ 54                                C. Intent

¶ 55    In the case at bar, defendant does not contest identity or the key events of the case. He does not deny: (1) that he was in the apartment; (2) that he was in the process of lifting the flat screen television; (3) that he had the intent to carry it away; or (4) that he bit the victim's lip. Thus, neither identity nor the key events are in dispute. Defendant does, however, contest that he did not have the necessary intent for the charges of residential burglary and aggravated battery. He claims that he did not intend to enter a dwelling place of another without authority and commit a felony or theft therein (720 ILCS 5/19-3(a) (West 2008)), because he believed Wanda lived in the apartment and had given defendant authority to enter the dwelling and remove the television. He also claims that he acted in self-defense when Witherspoon attacked him from behind.

¶ 56    We will discuss first the intent to enter the dwelling of another without authority and to commit a felony or theft therein, and will discuss self-defense in the next section.

¶ 57                          1. Residential Burglary

¶ 58    Defendant contests intent for the residential burglary conviction by using his own testimony of what his intent was. Defendant testified that Wanda told him that she was

moving and that she owned the television that defendant was in the process of removing from the apartment. However, the trial court did not find defendant's testimony credible. The trial court did not believe that defendant, who had to be at work, would help a stranger move without "getting any information as to whose apartment it was, what the items were, how many items there were, how the items would get transported, where the items would be taken or how long the process was expected to take." The trial court also stated defendant's attack of Witherspoon was not consistent with the actions of a man helping an acquaintance move her belongings. The trial court noted that there were new pry marks on the apartment door and that a screwdriver was found in defendant's pocket and another screwdriver was found in the hallway where defendant's other belongings were found.

¶ 59        Intent is usually shown through the surrounding circumstances. *Maggette*, 195 Ill. 2d at 354; *People v. Richardson*, 104 Ill. 2d 8, 12 (1984). "Such circumstances include the time, place, and manner of entry into the premises; the defendant's activity within the premises; and any alternative explanations offered for his presence." *Maggette,* 195 Ill. 2d at 354 (citing *Richardson*, 104 Ill. 2d at 13). In the case at bar, the trial court determined that defendant, along with the female referred to as Wanda, used two screwdrivers to pry open the apartment door, demonstrating an intent to burglarize and not an intent to help an acquaintance move. Defendant's actions within the premises, moving the television and wrapping the television cord around the television set, displayed an intent to commit a theft. The trial court found that defendant's attack of Witherspoon was further evidence that defendant did not enter the apartment to help an acquaintance move. We cannot find that no rational trier of fact could have concluded that defendant had the intent to burglarize Witherspoon's apartment. *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 60   Defendant also claims that Witherspoon's and Johnson's testimony is incredible and that this court should reverse for that reason. However, this court will not reverse a conviction solely based on a claim from a defendant that a witness was not credible. *Siguenza-Brito*, 235 Ill. 2d at 228; *People v. Evans*, 209 Ill. 2d 194, 211-12 (2004); *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). Ultimately, it is "[t]he trial judge, who saw and heard all the witnesses *** [is] in a much better position than are we to determine their credibility and the weight to be accorded their testimony." *Siquenza-Brito*, 235 Ill. 2d at 229; see also *People v. Wittenmyer*, 151 Ill. 2d 175, 191-92 (1992); *People v. Woods*, 26 Ill. 2d 582, 585 (1963). In this case, the trial court found that Witherspoon's and Johnson's testimony was not "substantially impeached." The trial court noted that Witherspoon's decision not to use his gun to fire on defendant showed that Witherspoon, who had training in firearms, was thinking and acting responsibly. The trial court also found that the confusion Witherspoon had in his preliminary testimony was understandable given the confusion generated by "house," "residence," and "apartment." The trial court concluded that Johnson was credible in that she identified the picture of how the apartment looked after the altercation and this identification was congruent with her testimony. We cannot find that no reasonable trier of facts would have found defendant's testimony credible and Witherspoon's and Johnsons testimony incredible. *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 61   The defense also argues that we should rely on *People v. Coulson,* 13 Ill. 2d 290, 297 (1958), which held that "[w]here testimony is contrary to the laws of nature, or universal human experience, this court is not bound to believe the witness." However, there is no evidence in this case that rises to the level of defying nature or universal human experience. The fact that defendant and Witherspoon struggled at the entry of Witherspoon's apartment

23

without knocking items over is not inherently impossible. The State argued, convincingly, that the photograph of the apartment showed an area in which two men could grapple and this area did not contain items that would be expected to fall over. The fact that defendant had three lacerations on his head when Witherspoon testified to hitting defendant on the head only "once or twice" also does not "defy nature." Both defendant and Witherspoon testified to a prolonged wrestling match, at one point rolling down a flight of stairs, and as the State pointed out, it is reasonable that the third laceration on defendant's head could have arisen from this altercation. Given the deference we give to the trial court's weighing of witness testimony and evidence, we cannot hold that the evidence was so unbelievable that a reversal of the conviction would be warranted. *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 62    For all the reasons stated above, we cannot find that no reasonable trier of fact would take the view that defendant entered into Witherspoon's apartment without authority and with the intent to commit a theft therein. *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 63                              2. Self-Defense

¶ 64    "The elements of self-defense are (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable." *People v. Lee*, 343 Ill. App. 3d 431, 436 (2003) (citing *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995)); 720 ILCS 5/7-1 (West 2008). The State only needs to negate one of these elements to disprove the claim of self-defense. *People v. Young*, 347 Ill. App. 3d 909, 920 (2004); *Lee*, 343 Ill. App. 3d at 436.

¶ 65        In addressing the claim of self-defense, the trial court stated that it did not find self-defense because Witherspoon did not hit defendant with his gun until after defendant had bit off a portion of Witherspoon's lip. The trial court also stated that, even if the sequence of events were different, *i.e.*, Witherspoon hit defendant with his gun before defendant bit Witherspoon's lip, it would be immaterial because defendant had broken into Witherspoon's apartment and was in the process of burglarizing it. Thus, the State negated (1) that any force used against defendant was unlawful; (2) that defendant was not the aggressor; (3) that the danger of harm to defendant was imminent before defendant bit Witherspoon's lip; and (4) that the use of force by defendant was necessary. *Lee*, 343 Ill. App. 3d at 436.

¶ 66        We do not find that no rational trier of facts could find as the trial court did. *People v. Belknap*, 2014 IL 117094, ¶ 67.

¶ 67        For the foregoing reasons, we affirm the trial court's conviction of defendant for residential burglary and aggravated battery.

¶ 68                            II.  *Pro Se* Ineffective Assistance of Counsel Claim

¶ 69        Defendant claims that the trial court failed to conduct a proper inquiry into his *pro se* claim for ineffective assistance of counsel, as required by *People v. Krankel*, 102 Ill. 2d 181, 189 (1984). Specifically, defendant argues that the judicial inquiry became adversarial when the State was allowed to rebut defendant's claims. Defendant argues that he was forced to defend himself against both his defense counsel and the State. Due to the adversarial nature of the inquiry, defendant claims that he should have been given the assistance of counsel during the hearing on the *pro se* motion.

¶ 70        Through *People v. Krankel* and its progeny, the Illinois Supreme Court has provided our trial courts with a clear blueprint for the handling of posttrial *pro se* claims of ineffective

assistance of counsel. *People v. Moore*, 207 Ill. 2d 68, 77-82 (2003) (discussing *Krankel* and its progeny); *People v. Chapman*, 194 Ill. 2d 186, 227-31 (2000) (same); *People v. Johnson*, 159 Ill. 2d 97, 124 (1994) (same). A trial court is not automatically required to appoint new counsel any time a defendant claims ineffective assistance of counsel. *Moore*, 207 Ill. 2d at 77; *Chapman*, 194 Ill. 2d at 230; *Johnson*, 159 Ill. 2d at 124; *People v. Nitz*, 143 Ill. 2d 82, 134 (1991). Instead, the trial court must first conduct an inquiry to examine the factual basis underlying a defendant's claim. *Moore*, 207 Ill. 2d at 77-78; *Chapman*, 194 Ill. 2d at 230; *Johnson*, 159 Ill. 2d at 124; *Nitz*, 143 Ill. 2d at 134.

¶ 71    A trial court may base its *Krankel* decision on: (1) the trial counsel's answers and explanations; (2) a "brief discussion between the trial court and the defendant"; or (3) "its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 78-79; *Chapman*, 194 Ill. 2d at 228-31; *People v. Peacock*, 359 Ill. App. 3d 326, 339 (2005). "If [a] trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." *Moore*, 207 Ill. 2d at 78; *Chapman*, 194 Ill. 2d at 230; *Johnson*, 159 Ill. 2d at 124. A claim lacks merit if it is " 'conclusory, misleading, or legally immaterial' or do[es] 'not bring to the trial court's attention a colorable claim of ineffective assistance of counsel.' " *People v. Burks*, 343 Ill. App. 3d 765, 774 (2003) (quoting *Johnson*, 159 Ill. 2d at 126). However, if a defendant's claims "indicate that trial counsel neglected defendant's case," the trial court must appoint new counsel. *People v. Ramey*, 152 Ill. 2d 41, 52 (1992); *Moore*, 207 Ill. 2d at 78; *Chapman*, 194 Ill. 2d at 230; *Johnson*, 159 Ill. 2d at 124.

¶ 72      We review *de novo* whether the trial court properly conducted the *Krankel* inquiry. *People v. Jolly*, 2014 IL 117142, ¶ 28; *Moore*, 207 Ill. 2d at 75. *De novo* consideration means we perform the same analysis that a trial judge would perform. *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25 (citing *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011)). If, however, the trial court has properly conducted the *Krankel* inquiry and reached a determination on the merits, we will reverse only if the trial court's action was manifestly erroneous. *Tolefree*, 2011 IL App (1st) 100689, ¶ 25; *People v. McCarter*, 385 Ill. App. 3d 919, 941 (2008). " 'Manifest error' is error that is clearly plain, evident, and indisputable." *Tolefree*, 2011 IL App (1st) 100689, ¶ 25 (citing *People v. Morgan*, 212 Ill. 2d 148, 155 (2004)).

¶ 73      In *Jolly*, our supreme court cited with approval *People v. Fields*, 2014 IL App (2d) 120945, ¶ 40, which held: "virtually no opportunity for State participation is offered" during the initial *Krankel* hearing. See *People v. Jolly*, 2014 IL 117142, ¶ 34. "If the State's participation during the initial investigation into a defendant's *pro se* allegations is anything more than *de minimis*, there is a risk that the preliminary inquiry will be turned into an adversarial proceeding, with both the State and trial counsel opposing the defendant." *People v. Fields*, 2013 IL App (2d) 120945, ¶ 40, cited with approval by *People v. Jolly*, 2014 IL 117142, ¶ 34.

¶ 74      In *Jolly,* our supreme court held:

     "[W]e believe that a preliminary *Krankel* inquiry should operate as a neutral and nonadversarial proceeding. Because a defendant is not appointed new counsel at the preliminary *Krankel* inquiry, it is critical that the State's participation at that

proceeding, if any, be *de minimis*. Certainly, the State should never be permitted to take an adversarial role against a *pro se* defendant at the preliminary *Krankel* inquiry.

*** [T]he purpose of *Krankel* is best served by having a neutral trier of fact initially evaluate the claims at the preliminary *Krankel* inquiry without the State's adversarial participation, creating an objective record for review. This goal, however, is circumvented when the circuit court essentially allows the State to bias the record against a *pro se* defendant during the preliminary *Krankel* inquiry." *People v. Jolly,* 2014 IL 117142, ¶¶ 38-39.

¶ 75    Last year, our supreme court held in the seminal *Jolly* case that if the State is allowed to participate in the *Krankel* inquiry in an adversarial manner it is reversible error. *People v. Jolly*, 2014 IL 117142, ¶ 46.

¶ 76    In *Jolly*, our supreme court held that a circuit court committed reversible error when it allowed the State to question defendant and defense counsel in a manner that rebutted defendant's allegations. *People v. Jolly*, 2014 IL 117142, ¶ 40. In *Flemming* we found the trial court committed reversible error when, during a *Krankel* inquiry, the court allowed the State to ask defense counsel a total of seven questions. *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 91.

¶ 77    In *Flemming*, the only published case to discuss *Jolly*, we found:

"Here, although the State's participation was minimal, its questioning of defense counsel did tend to counter defendant's *pro se* allegations. Contrary to the supreme court's instruction in *Jolly*, the State's questions to defense counsel and responses received to those questions rebutted defendant's *pro se* allegations, specifically his allegations that his counsel misinformed him regarding the number of stab wounds

28

[the victim] received and his counsel should have made [the codefendant's] prior history of aggression part of the record. By the State's questions and defense counsel's responses, they 'effectively argued against defendant at a proceeding when he appeared *pro se*,' which 'is contrary to the intent of a preliminary *Krankel* inquiry.' [*People v. Jolly*, 2014 IL 117142, ¶ 40].

Following *Jolly*, we find the court committed reversible error by allowing the State to rebut defendant's *pro se* allegations at the preliminary *Krankel* inquiry. [Citation.] By allowing the State, through its questioning of defense counsel, to rebut defendant's allegations, the record at the preliminary *Krankel* inquiry was not produced in an objective and neutral fashion such that the trial court could properly decide whether defendant was entitled to new counsel." *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶¶ 90-91.

¶ 78          In *Flemming*, during the *Krankel* hearing, the defendant claimed that his counsel was ineffective because defense counsel failed to present an accurate number of stab wounds inflicted on the victim and failed to present evidence that the defendant's codefendant had a criminal history. *Flemming*, 2015 IL App (1st) 111925-B, ¶ 45. The trial court allowed the State to examine defense counsel and the State asked defense counsel a total of seven questions. *Flemming*, 2015 IL App (1st) 111925-B, ¶ 46. In response to these questions, defense counsel testified that she had discussed the number of stab wounds the victim received with the defendant and that she had not presented the codefendant's prior criminal history as a matter of trial strategy. *Flemming*, 2015 IL App (1st) 111925-B, ¶ 46. These questions were the extent of the State's involvement, and the trial court denied the defendant's *pro se* posttrial motion. *Flemming*, 2015 IL App (1st) 111925-B, ¶ 47.

¶ 79        We begin our analysis by noting that the *Jolly* decision was not available when the trial court conducted its *Krankel* inquiry. A holding from our supreme court may be applied retroactively when it is not announcing a new constitutional rule of criminal procedure. *People v. Sanders*, 238 Ill. 2d 391, 413 (2010); *People v. Moore*, 177 Ill. 2d 421, 430 (1997). " '[A] case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.' " (Emphasis in original.) *Moore*, 177 Ill. 2d at 431 (quoting *Teague v. Lane,* 489 U.S. 288, 301 (1989)). "A case does not announce a new rule if it has simply applied a well-established constitutional principle to govern a case which is closely analogous to those which have been previously considered in the prior case law." (Internal quotation marks omitted.) *People v. Moore*, 177 Ill. 2d 421, 431 (1997) (quoting *Penry v. Lynaugh,* 492 U.S. 302, 314 (1989)). In *Jolly,* our supreme court was not announcing a new rule but, rather, accepting a rule which had previously existed, but which conflicted with certain appellate opinions. *Jolly*, 2014 IL 117142, ¶ 38; see, *e.g.*, *Fields*, 2013 IL App (2d) 120945, ¶ 40. We find, as we did in *Flemming*, that our supreme court's holding in *Jolly* should be applied retroactively. *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 91.

¶ 80        In the case at bar, the trial court committed reversible error when it allowed the State to take an adversarial position against defendant. The State asks that we distinguish the case at hand from *Jolly*, noting that in this case the State did not respond to each of defendant's claims as they were raised and was only invited to respond to defendant's claims after the court had fully heard from defendant and defense counsel. However, the arbitrary distinction of *when* the State is allowed to rebut defendant's claims is not what determines if the *Krankel* inquiry was adversarial. In *Jolly*, our supreme court held that the "preliminary *Krankel*

inquiry should operate as a neutral and nonadversarial procedure." *People v. Jolly*, 2014 IL 117142, ¶ 38. Whether the State takes an adversarial position by rebutting defendant's claims as they are raised or takes an adversarial position by rebutting multiple of defendant's claims at the end of the inquiry is immaterial. See, *e.g.*, *People v. Jolly*, 2014 IL 117142, ¶ 40 ("[T]he State and defendant's trial counsel effectively argued against defendant at a proceeding when he appeared *pro se*. As we explained above, this is contrary to the intent of a preliminary *Krankel* inquiry."); *People v. Boose*, 2014 IL App (2d) 130810, ¶ 37 ("because the State did more than offer concrete and easily verifiable facts at the hearing, the denial of defendant's *pro se* claims must be vacated"). In both scenarios the *pro se* inquiry turns adversarial "with both the State and trial counsel opposing the defendant." *People v. Fields*, 2013 IL App (2d) 120945, ¶ 40.

¶ 81    In *Flemming,* we held that even though the State's participation was minimal, the fact that the State's questioning of defense counsel "did tend to counter defendant's *pro se* allegations" made the inquiry adversarial. *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 90. In the case at bar, the State's comments went even further by directly countering defendant's claims. The State gave reasons, not raised by defense counsel, for why defense counsel would not have succeeded in suppressing the screwdriver, arguing "[b]ecause the officer said he did a patdown [*sic*] and didn't feel it and it was later recovered is not a basis, as your Honor is well aware, of a motion to quash arrest or suppress evidence." The State directly countered defendant's claim that the ASA's statement should have been suppressed, arguing that the statement and defendant's testimony were "generally the same" and that defendant wanting to suppress the testimony "when he testified to those exact facts flies in the face of common sense." The State reiterated defense counsel's reasoning for not calling

31

Investigator Stewart as a witness, stating that it would not have impeached Witherspoon or Johnson. Moreover, the State argued that defendant's overall claims "fly in the face of everything that was done at this multi-day trial." In light of our supreme court's decision in *Jolly* and our decision in *Flemming*, the State's participation changed the preliminary *Krankel* hearing from an objective or neutral inquiry into an adversarial inquiry.

¶ 82    Since we have determined that the *Krankel* inquiry was not properly conducted, there is no need at this time for us to determine the merits of the trial court's *Krankel* findings.

¶ 83    Where the State has taken an inappropriate adversarial position during a preliminary *Krankel* inquiry, the "appropriate remedy is to remand for a new preliminary *Krankel* inquiry before a different judge and without the State's adversarial participation." *People v. Jolly*, 2014 IL 117142, ¶ 46. Thus, we remand for a new preliminary *Krankel* inquiry before a different judge and without the State's adversarial participation. We remand before a different judge because our supreme court instructed us in *Jolly* to do this whenever the trial court allows an adversarial participation by the State. *Jolly*, 2014 IL 117142, ¶ 46.

¶ 84                                  III. Excessive Sentencing

¶ 85    Defendant claims that the trial court erred at his sentencing: (1) by excessively sentencing defendant to 30 years for residential burglary based on the trial court's finding that Witherspoon's speech impediment was caused by the defendant biting off a portion of Witherspoon's lip, and; (2) by giving an extended-term sentence for the lesser offense of aggravated battery. We will consider each claim in turn.

¶ 86                                  A. Standard of Review

¶ 87    The Illinois Constitution requires penalties to be determined "both according to the seriousness of the offense and with the objective of restoring the offender to useful

citizenship." Ill. Const. 1970, art. I, § 11. Balancing these retributive and rehabilitative purposes of punishment "requires careful consideration of all factors in aggravation and mitigation, including, *inter alia*, the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Center*, 198 Ill. App. 3d 1025, 1033 (1990). However, the mere fact that a reviewing court might have weighed the factors differently than the trial court does not justify an altered sentence. *People v. Grace*, 365 Ill. App. 3d 508, 512 (2006).

¶ 88        Instead, a trial court's sentencing decisions are entitled to great deference and will not be disturbed on appeal absent an abuse of discretion. *People v. Spicer*, 379 Ill. App. 3d 441, 465 (2008) (quoting *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007)). " 'A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense.' " *Spicer*, 379 Ill. App. 3d at 465 (quoting *Jackson*, 375 Ill. App. 3d at 800).

¶ 89                    B. Sentencing for Residential Burglary

¶ 90        The trial court sentenced defendant as a Class X offender based on his conviction for nine previous residential burglaries. 730 ILCS 5/5-4.5-95 (West 2008). The trial court considered multiple factors in aggravation and mitigation. In aggravation, the court considered defendant's nine previous residential burglaries, the fact that defendant was still on mandatory supervised release for eight of the residential burglaries, and that the residential burglary involved in the case at bar had turned violent. In evaluating the violence involved in this case, the trial court noted that Witherspoon had suffered "the loss of his lip, the extreme loss of blood and passing out from that, the speech impediment to this day,

which I noticed Mr. Witherspoon had when he testified at trial." In mitigation, the trial court took into consideration the circumstances of defendant's unfortunate childhood and the fact that defendant had maintained employment since his last release from prison. The trial court sentenced defendant to 30 years for residential burglary, the maximum sentence allowed by statute. 730 ILCS 5/5-4.5-95 (West 2008). In doing so, the trial court stated that part of the reason for the length of the sentence was that the defendant "won't stop doing crimes."

¶ 91        With regard to the sentence for residential burglary, defendant objects only to the fact that the trial court considered Witherspoon's speech impediment being a result of defendant biting off a portion of his lip. Defendant argues that there was no evidence put forth at trial that Witherspoon developed a speech impediment as a result of having a portion of his lip bit off by defendant, and that there was no evidence presented at trial showing that Witherspoon did not have a speech impediment before the injury.

¶ 92        A trial judge has a "wide discretion in the sources and types of evidence" that the judge may use during sentencing. (Internal quotation marks omitted.) *People v. Foster*, 119 Ill. 2d 69, 96 (1987); *People v. Eddmonds*, 101 Ill. 2d 44, 65 (1984)*; People v. Adkins,* 41 Ill. 2d 297, 300 (1968). "The only requirement for admission [of evidence] is that the evidence be reliable and relevant [citations] as determined by the trial court within its sound discretion." *People v. Foster*, 119 Ill. 2d 69, 96-97 (1987); see also *People v. Perez*, 108 Ill. 2d 70, 88 (1985); *People v. Davis*, 95 Ill. 2d 1, 43 (1983). "The source and type of admissible information is virtually without limits." *People v. Sims*, 403 Ill. App. 3d 9, 23 (2010) (citing *People v. Rose*, 384 Ill. App. 3d 937, 940-41, (2008)). Moreover, a trial judge is allowed to make reasonable inferences from the evidence when sentencing a defendant. *People v.*

*Chapman*, 194 Ill. 2d 186, 253 (2000); *People v. Alexander*, 127 Ill. App. 3d 1007, 1018 (1984).

¶ 93        We cannot find that the trial court abused its discretion during sentencing when it made a reasonable inference as to the long-lasting effects of defendant's attack on Witherspoon. Witherspoon testified that he suffered severe pain from the attack and went through subsequent surgeries, and he also testified to ongoing problems as a result of the attack, with his lip turning white and "peeling." It is not unreasonable to believe that the damage to Witherspoon's lip left Witherspoon unable to speak clearly. We note that it was the trial judge who observed the injury to the victim and heard him speak and was therefore in a much better position to determine whether consideration of Witherspoon's speech impediment was reliable and relevant. See *People v. Kliner*, 185 Ill. 2d 81, 171 (1998); *Foster*, 119 Ill. 2d at 96; *Eddmonds*, 101 Ill. 2d at 65.

¶ 94        Even if the trial court was in error in considering Witherspoon's speech impediment being caused by the removal of a portion of his lip, we would not feel compelled to reverse the sentencing. A reviewing court need not reverse where a single improper consideration during sentencing was not the dominant factor considered. *People v. Steppan*, 105 Ill. 2d 310, 322-23 (1985); *People v. Sims*, 403 Ill. App. 3d at 24. When the appellate court reviews a sentence, it "should not focus on a few words or statements made by the trial court, but must consider the record as a whole." *Sims,* 403 Ill. App. 3d at 24 (citing *People v. Reed*, 376 Ill. App. 3d 121, 128 (2007)).

¶ 95        When viewing the record as a whole, we cannot conclude that the trial court abused its discretion. Even if we ignored any finding as to a speech impediment, defendant still has nine prior residential burglary convictions and was still on mandatory supervised release for

eight of those prior convictions at the time of this offense. This residential burglary turned violent and defendant caused Witherspoon great bodily harm, which required surgery. The attack left Witherspoon with lasting effects, namely, his lip changes color and peels. The trial court did not abuse its discretion in determining that a repeat offender whose streak of burglaries had turned violent and who "wo[uldn't] stop committing crimes" required a lengthy sentence. In so finding, we keep in mind that " '[a] trial court need not place greater weight on a defendant's rehabilitation potential than on the seriousness of the offense and the need to protect the public.' " *People v. Elam*, 294 Ill. App. 3d 313, 324 (1998) (quoting *People v. Lintz,* 245 Ill. App. 3d 658, 668 (1993)); see also, *e.g, People v. Stacey*, 193 Ill. 2d 203, 211 (2000); *People v. Lindsey*, 2013 IL App (3d) 100625, ¶ 58. Here the protection of the public appears to be paramount.

¶ 96  For the foregoing reasons we affirm the sentence of 30 years for residential burglary.

¶ 97        C. Sentencing for Aggravated Battery

¶ 98  Defendant also claims that the trial court abused its discretion in sentencing him to a seven-year extended-term sentence for aggravated battery.

¶ 99  Before addressing defendant's claims, we need to respond to the State's argument that defendant has forfeited his right to review. The State argues that defendant did not object during sentencing and that defendant's "Motion to Reconsider Sentence" did not allege that the sentence for aggravated battery was improper. However, a sentence not authorized by statute is void. *People v. Thompson*, 209 Ill. 2d 19, 23 (2004); *People ex rel. Waller v. McKoski*, 195 Ill. 2d 393, 401 (2001); *People v. Williams*, 179 Ill. 2d 331, 336 (1997); *People v. Arna*, 168 Ill. 2d 107, 113 (1995). Moreover, "[a] void judgment may be attacked at any time, either directly or collaterally." *People v. Wade*, 116 Ill. 2d 1, 5 (1987);

36

see also *People v. Simmons*, 256 Ill. App. 3d 651, 653 (1993); *People v. Perruquet*, 181 Ill. App. 3d 660, 663 (1989). Therefore, the issue whether the trial court's sentencing of defendant was in excess of the sentence authorized by statute is before this court for review.

¶ 100        Defendant argues that section 5-8-2(a) of the Unified Code of Corrections mandates that an offender with multiple convictions can receive an extended term sentence only for the most serious offense. 730 ILCS 5/5-8-2(a) (West 2008). In the case at bar, residential burglary was the most serious offense and, thus, defendant argues that his extended-term sentence for aggravated battery is void.

¶ 101        In interpreting section 5-8-2(a) of the Unified Code of Corrections (730 5/5-8-2(a) (West 2008)), our supreme court has stated that "when a defendant has been convicted of multiple offenses of differing classes, an extended-term sentence may be imposed only on the conviction within the most serious class." *People v. Thompson*, 209 Ill. 2d 19, 23 (2004). However, our supreme court has noted an exception in *People v. Bell*, 196 Ill. 2d 343, 354 (2001). In *Bell*, our supreme court stated:

>        "If there was a substantial change in the nature of the criminal objective, the defendant's offenses are part of an 'unrelated course of conduct' and an extended-term sentence may be imposed on differing class offenses. If, however, there was no substantial change in the nature of the criminal objective, the defendant's offenses are not part of an unrelated course of conduct, and an extended-term sentence may be imposed only on those offenses within the most serious class."
> *Bell*, 196 Ill. 2d at 354-55.

¶ 102        "The determination of whether a defendant's actions constitute a single course of conduct" or is part of an unrelated course of conduct "is a question of fact for the trial court

to determine, and a reviewing court will defer to the trial court's conclusion unless that conclusion is against the manifest weight of the evidence." *People v. Hummel,* 352 Ill. App. 3d 269, 271 (2004) (citing *People v. Sergeant*, 326 Ill. App. 3d 974, 988 (2001)). "A factual finding is against the manifest weight of the evidence only if the opposite conclusion is readily apparent or when the finding appears to be unreasonable, arbitrary or not based on the evidence." *In re Kenneth W.*, 2012 IL App (1st) 101787, ¶ 60; *Vancura v. Katris*, 238 Ill. 2d 352, 386 (2010). However, whether the trial court applied a proper construction of a statute is a question of law that we review *de novo*. *People v. Harris*, 203 Ill. 2d 111, 116 (2003); *People v. Robinson*, 172 Ill. 2d 452, 457 (1996). "*De novo* consideration means we perform the same analysis that a trial judge would perform." *People v. Tolefree*, 2011 IL App (1st) 100689, ¶ 25 (citing *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011)).

¶ 103      We begin our analysis by noting that the trial court made no explicit statement finding that defendant's criminal objective changed between the residential burglary and the aggravated battery. However, there is a presumption that a trial court knows the law and applies it. *People v. Gaultney*, 174 Ill. 2d 410, 420 (1996); *People v. Taylor*, 344 Ill. App. 3d 929, 937 (2003). Thus, we must presume that the trial court reasoned that there was a substantial change in defendant's criminal objective.

¶ 104      In determining what constitutes a "substantial change in the nature of the criminal objective," defendant and the State each urge this court to consider cases with details similar to those of the case at bar but they reach drastically different conclusions.

¶ 105      Defendant urges the court to rely upon the Second District's decision in *People v. Arrington*, 297 Ill. App. 3d 1 (1998). In *Arrington*, the defendant robbed a supermarket with a replica pistol and hit a store manager over the head with the replica when the store manager

attempted to prevent the defendant from leaving the store. *Arrington*, 297 Ill. App. 3d at 2. The trial court held that between the crimes of attempted robbery and aggravated battery there was a substantial change in criminal objective, and it subsequently sentenced the defendant to two consecutive extended-term sentences. *Arrington*, 297 Ill. App. 3d at 2. The appellate court modified the sentence, holding, "[w]e believe that inherent in any plan to rob a store is also an intention for the robber to escape from the premises with the purloined proceeds." *Arrington*, 297 Ill. App. 3d at 5. The court held that the defendant's attack on the store manager was "merely to effectuate his original intent to rob the store and escape from the premises." *Arrington,* 297 Ill. App. 3d at 6. It should be noted that in *Arrington*, the court was only viewing whether there was a change in the criminal objective in order to evaluate if consecutive sentences were appropriate. However, our supreme court has held that the same "substantial change in criminal objective" test is used in determining if defendant can justifiably receive consecutive sentences, as well as in determining if defendant can receive an extended-term sentences for a lesser offense. *Bell*, 196 Ill. 2d at 355.

¶ 106         In sharp contrast to the holding in *Arrington* is the Third District's holding in *People v. Hummel*, 352 Ill. App. 3d 269 (2004). In *Hummel*, the defendant was acting as a getaway driver while his co-conspirators entered into stores and attempted to shoplift. *Hummel*, 352 Ill. App. 3d at 270. In their last attempt to rob a store, the co-conspirators were discovered and a security guard attempted to prevent the defendant from leaving by placing herself in front of the defendant's vehicle. *Hummel*, 352 Ill. App. 3d at 270. The defendant hit the security guard with his vehicle in order to escape and was convicted of burglary and aggravated battery, to run consecutively. *Hummel,* 352 Ill. App. 3d at 270. The trial court gave the defendant an extended-term sentence for aggravated battery and the defendant

appealed, arguing that because the crimes were part of a single course of conduct the consecutive sentence and extended-term sentence for aggravated battery were inappropriate. *Hummel*, 352 Ill. App. 3d at 270. In affirming the trial court, the appellate court held that there was a substantial change in criminal objective because the defendant's original objective was to "stealthily obtain items of merchandise from the store" and once discovered the defendant's objective changed to "avoiding apprehension." *Hummel*, 352 Ill. App. 3d at 273.

¶ 107     We believe that the court in *Arrington* had the stronger reasoning. It seems merely common sense that a burglar who is attempting not to be detected maintains a constant objective to escape throughout the burglary, regardless of how he or she may have to effectuate that escape. To claim otherwise is to manifest patently absurd scenarios; the stealthy burglar who begins to burglarize but has no objective of ever leaving the scene of the crime; the considerate burglar who plans to burglarize but only plans to escape if in doing so he will not harm or inconvenience anyone; or, as *Hummel* seems to imply, the simpleton burglar who only has one method of escape planned out and must "change his criminal objective" if discovered. Our supreme court has likewise noted:

> " 'A plan to commit robbery would be futile if it did not comprehend an escape with the proceeds of the crime. These factual circumstances are inseparable. Unless the plan of robbery is to terrify the victim, and, if occasion requires, to kill any person attempting to apprehend them at the time of or immediately upon gaining possession of the property, it would be inane and child-like.' " *People v. Klebanowski*, 221 Ill. 2d 538, 547 (2006) (quoting *People v. Bongiorno*, 358 Ill. 171, 174 (1934)).

¶ 108    In the case at bar, the trial court found that defendant intended to rob Witherspoon and that he attacked Witherspoon when he found Witherspoon blocking his escape. The trial court vacated the conviction of home invasion, based on the fact that defendant was trying to leave when stopped by Witherspoon. Thus, defendant did not have an independent objective to harm Witherspoon. Witherspoon acknowledges that he prevented defendant from leaving the doorway and that a fight therein ensued. Had Witherspoon simply stood to the side, it is quite likely that defendant would have simply fled the scene. The point is, defendant's only real objective was to finish what he had started, burglarizing Witherspoon and then escaping, and any harm done to Witherspoon was merely a means to effectuate that objective.

¶ 109    In creating the "substantial change in criminal objective" test, our supreme court specifically reasoned that it wanted to avoid creation of a test in which virtually all crimes involving multiple offenses would be liable to have extended terms imposed upon the lesser offense. *Bell*, 196 Ill. 2d at 353. Yet, in *Hummel* this is exactly what was done. A determination that a criminal changes his or her objective from "stealthily" trying to burglarize to "escape" would seriously limit the application of section 5-8-2(a) of the Uniform Code of Corrections. 730 ILCS 5/5-8-2(a) (West 2008). Under *Hummel*, almost any time offenders ran from the police they would be liable for an extended-term sentence because their criminal objective had shifted from whatever crime they were effectuating to "escape." Such a result seems to be incongruous with our supreme court's reasoning for adopting the "substantial change in criminal objective" test.

¶ 110    Further, by making the determination that the burglar's original objective was to "stealthily" purloin goods and then escape unnoticed, the court seems to be indicating that had the burglar merely entered the premises with the intent to violently take the goods he or

she would be liable for the exact same convictions but not liable for multiple extended term sentences. Should we truly be making a rule that rewards burglars who plan from the onset of their actions to use violence, and punishes those who attempt to commit their crimes without resorting to violence? The law should, ideally, work to discourage violence, and the reasoning in *Hummel* runs counter to this principle.

¶ 111    The *Hummel* court stated that a determinative factor was that the defendant's actions shifted from the store to the employee, yet it gave no reasoning as to why a change in the direction of one's actions changes a criminal objective. *Hummel*, 352 Ill. App. 3d at 273. We can find no case law where our supreme court has suggested that a shift in where the defendant's actions are directed is part of the consideration in the "substantial change in criminal objective" test. See, *e.g.*, *Bell*, 196 Ill. 2d at 352-56.

¶ 112    We note that our conclusion today runs counter to the decision in *Hummel.* However, our decision draws support from the reasoning of a number of other appellate court cases. *People v. Smith*, 345 Ill. App. 3d 179, 190 (2d Dist. 2004) (giving police a fake ID after being pulled over for driving under the influence was not a substantial change in criminal objective); *People v. Radford*, 359 Ill. App. 3d 411, 421 (1st Dist. 2005) (attacking victim whom defendant was burglarizing was a substantial change in criminal objective because the attack was *not* necessary in order to effectuate an escape). In *Radford*, this court held that there was a substantial change because "there is no indication that [the victim] was trying to stop defendant from fleeing the scene or even that she happened to be standing in his escape path." *Radford*, 359 Ill. App. 3d at 421. By contrast, in the case at bar, the victim, who was also a security guard for the building, testified that he was blocking the doorway and that

there was no clear path for defendant to escape from the apartment, save for the doorway blocked by Witherspoon.[6]

¶ 113    A reviewing court may modify a sentence that was ordered in error. *People v. Whitfield*, 217 Ill. 2d 177, 205 (2005); *People v. Muhammad*, 257 Ill. App. 3d 359, 372 (1993). Aggravated battery is a Class 3 felony under section 12-4(a) of the Criminal Code of 1961, which carries a maximum sentence of five years. 720 ILCS 5/12-4(a) (West 2008); 730 ILCS 5/5-4.5-40(a) (West 2008). For the foregoing reasons, we modify the mittimus to reflect that defendant's aggravated battery sentence is reduced to 5 years, and to run concurrently with defendant's 30-year residential burglary sentence as the trial court ordered.

¶ 114                                IV. Fines And Fees

¶ 115    Defendant claims that the "Order Assessing Fines, Fees, and Costs" reflects an incorrect total of fines and fees owed by defendant. Defendant received credit of $5 a day for the 1,104 days he was incarcerated while awaiting trial. This credit should have been applied to the $50 in fines reflected in the "Order Assessing Fines, Fees, and Costs." The trial court also incorrectly applied a $5 electronic citation fee, which should be removed. 705 ILCS 105/27.3e (West 2012) (electronic citation fee applies only to "traffic, misdemeanor, municipal ordinance, or conservation case[s]"). Finally, the initial calculation of the fines and fees showed $370 in fees and costs and $50 in fines; however, it lists a total of $445 owed by

---

[6] Even if we were persuaded by the reasoning of *Hummel*, that case is distinguishable because the *Hummel* court based its holding, in part, on the fact that the burglary involved was a shoplifting, a crime where the offender expected "to stealthily obtain items of merchandise from the store." *Hummel*, 353 Ill. App. 3d at 272. The *Hummel* court contrasted shoplifting to an offense where a perpetrator should reasonably expect "confrontation or violence." *Hummel*, 353 Ill. App. 3d at 272. By contrast, in the case at bar, the burglary involved breaking and entering a residence and removing valuables from the residence while the residents were at home and immediately outside. As a result, the expectations and intent involved in the shoplifting in *Hummel* are different from those involved in the case at bar.

defendant instead of $420. After removing the $5 electronic citation fee, applying defendant's credit to the fines, and correctly adding the fines and fees, the total amount of fines and fees due from defendant should be $365. The State agrees with this calculation, and we therefore correct the "Order Assessing Fines, Fees, and Costs" to reflect that the fines and fees due from defendant is $365.

¶ 116                                    CONCLUSION

¶ 117          For the foregoing reasons, we do not find persuasive defendant's claims: (1) that the State's evidence was insufficient to prove residential burglary and aggravated battery; and (2) that the sentence for residential burglary was excessive. However, defendant is correct that he engaged in a single course of action when a security guard blocked defendant's only escape path and defendant bit off a portion of his lip. Thus, the extended-term sentence on the lesser offense of aggravated battery was inappropriate and we correct the mittimus to reflect a five-year sentence for that offense. We also correct the fines, fees, and costs due from defendant to $365. In addition, we remand for a *Krankel* hearing before a different judge, as required by our supreme court's decision in *People v. Jolly*, 2014 IL 117142, ¶ 46.

¶ 118          Affirmed in part; reversed in part and remanded with instructions; mittimus and fines and fees order corrected.