2021 IL App (1st) 190585-U

No. 1-19-0585

Order filed May 20, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 12091 |
| | ) | |
| ABDOULA JIMERSON, | ) | Honorable |
| | ) | Brian K. Flaherty, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the judgment of the circuit court when it conducted an adequate inquiry into defendant's *pro se* posttrial claim of ineffective assistance of counsel.

¶ 2    Following a jury trial, defendant Abdoula Jimerson was found guilty of two counts of first degree murder during which he discharged a firearm. The trial court merged the findings and sentenced defendant to 48 years in prison for first degree murder (720 ILCS 5/9-1(a)(1) (West 2014)). On appeal, defendant contends that the trial court failed to conduct an adequate preliminary

inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), into his *pro se* posttrial claim that trial counsel "usurped" his decision to be tried by the bench or jury. We affirm.[1]

¶ 3    Defendant was charged by indictment with eight counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2014)) arising out of the June 16, 2014 shooting death of his cousin Frank "Nitty" Carter.[2]

¶ 4    At a pretrial hearing on August 23, 2018, the case was continued by agreement for a jury trial. On October 15, 2018, the State acknowledged the case was set for a jury trial that day but did not answer ready as a witness was not present. The defense demanded trial, and the court continued the case for a jury trial on December 4, 2018. On December 5, 2018, the State told the court that it would proceed to trial on two counts of first degree murder, and a jury was selected.

¶ 5    Frank's sister, Renisha Carter, testified that defendant and Frank were close. On June 15, 2015, Renisha left her home between 11:30 p.m. and midnight to get food. When she returned, Frank and defendant were outside. After Renisha went inside, she heard them arguing. When Renisha looked outside, she saw defendant, Frank, and a couple other men. Defendant said he would kick Frank's "butt," and 10-15 minutes later Frank said that defendant "was not going to do nothing." Renisha called her boyfriend, but when he arrived 10 minutes later, defendant and Frank were gone. Renisha's boyfriend called defendant from her phone, but there was no answer. When defendant called back around 12:30 a.m., Renisha heard Frank's voice in the background. Defendant's voice was loud, and the "tone" was not "right." As defendant hung up, Renisha heard

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] Because Frank Carter and a witness, Renisha Carter, have the same last name, we will refer to them by their first names.

defendant say something to Frank, but she did not remember what it was. The next morning, Renisha learned that Frank was dead.

¶ 6     During cross-examination, Renisha clarified that she returned home around 11:30 p.m., and defendant called between 12:30 a.m. and 12:35 a.m. She was unsure if she told a Chicago Heights police officer that defendant called at 1 a.m.

¶ 7     James Berti testified that on June 16, 2014, he worked at a Mobile gas station on West 14th Street in Chicago Heights. Around 1 a.m., a man entered and said he killed someone and to call the police. Berti identified defendant in court as that person. Defendant "recognized" a woman in the store, and said "[w]hat's up," he had shot his cousin, and to call the police. Defendant then said, " 'What I gotta do, piss on the floor to get you to call the cops?' " and urinated on the floor. Another employee then contacted the police. Defendant paced around briefly and then left the store. Later that day, Berti identified defendant in a line-up at a police station. At trial, Berti identified himself and defendant on footage from the gas station. During cross-examination, Berti acknowledged that neither he nor the female customer immediately called the police.

¶ 8     Valerie Flannel testified that in 2014 she and defendant were a couple. Although defendant had keys to her home, he did not live with her and her daughter, Casunja Flannel.[3] On the evening of June 15, 2014, defendant left the house and Valerie went to bed. Several hours later, she woke when defendant returned. Defendant mumbled that he loved her and had shot Nitty. Defendant asked if she loved him, and she replied yes. Defendant then asked Casunja if she loved him and she mumbled a response. At this point, Valerie was standing in her bedroom doorway and had no trouble understanding defendant.

---

[3] For clarity, we refer to Valerie Flannel and Casunja Flannel by their first names.

¶ 9    Defendant then went to the kitchen, returned, and cut off his shirt with a steak knife. Defendant said he would kill Valerie and "lunged" at her. She stepped back into her bedroom, locked the doors to the bedroom, and called Casunja to ask if defendant was still there. Although Casunja said defendant left, Valerie was afraid to leave through her front door, so she jumped off her second-floor balcony, breaking her ankle, and went to her vehicle. Although one of the tires was slashed, she drove to a neighboring parking lot. Valerie called Casunja and told her to run to the vehicle. After having her tire changed, she went to a hospital to have her broken ankle treated and then to a police station to obtain a restraining order against defendant. When officers accompanied her home, defendant's house keys were on the dining room table and his clothes were gone. Additionally, there was hair "all over" the bathroom and a glove on the bathroom floor that did not belong to her.

¶ 10    During cross-examination, Valerie acknowledged that some time prior to June 2014 she learned defendant was cheating on her. Although defendant was hard to understand because he was mumbling, he said " 'I shot Nitty.' " She did not remember whether she told the police on the night of the incident what defendant said, but she told detectives on June 18, 2014, that defendant admitted to killing Frank. Following this incident, Valerie wrote several letters to defendant. Although she initially did not recall a February 12, 2015 letter, she acknowledged that she referred to herself as defendant's wife in the letter and stated that he hurt her by cheating and " 'I guess that is why it was so easy for me to tell the police that.' "

¶ 11    During redirect, Valerie denied writing in any letters that she told the police something untrue or only told the police certain things because defendant cheated. Defendant's infidelity was not the only reason she spoke to the police.

¶ 12    Casunja testified that she was 15 years old in June 2014. After being awoken by defendant's voice on June 15, 2014, she heard him say, " 'I shot Nitty.' " Valerie exited her bedroom and defendant said it again and explained that he killed Frank because Frank urinated in his drink. Defendant then said that Valerie "would try and kill him," went into the kitchen, returned, and "came after" Valerie with a knife, but Valerie closed and locked a door. Defendant knocked on the door, and then asked Casunja if he should kill Valerie. She said no, and defendant ran to the bathroom. Casunja plugged in her phone to charge it so she could call for help. Defendant left the apartment. Once Casunja's phone powered on, Valerie called and asked if defendant was still there. After Casunja said no, Valerie exited her room and said they had to leave by jumping off the balcony. Casunja said no, and stayed inside until Valerie called and told her to run.

¶ 13    Chicago Heights police officer Kevin Droba testified that he and his partner arrived at the Mobile station around 1:21 a.m. on June 16, 2014, and spoke to a clerk but did not locate a suspect. Around 5:40 a.m., Droba spoke with Valerie about a domestic complaint and accompanied her home. Droba later responded to a call in the 400 block of West 15th Place in Chicago Heights, where he saw a man facedown on the ground.

¶ 14    Tinley Park police commander Stanley Tencza testified that in June 2014 he was an investigator assigned to the South Suburban Major Crimes Task Force. Around 8:30 a.m. on June 16, 2014, he responded to the scene of a murder in the 400 block of West 15th Place in Chicago Heights. Later that morning, he learned that a suspect called police in order to surrender himself. Tencza relocated, arrested defendant, and later administered a gunshot residue (GSR) test to him.

¶ 15    Illinois State police sergeant Darrell Stafford testified that he processed the crime scene. He observed a blood trail leading to the west, as well as a baseball cap, a glove, and several shirts.

The victim was facedown and shirtless on the ground. There was a black glove near the victim's right hip, and two white shirts and a cement block near the victim's head.

¶ 16    Forensic biologist William Anselme testified that he preserved a blood sample taken from a right-hand glove for DNA analysis.

¶ 17    Chicago Heights police sergeant Stephen Bakowski testified that he was present when a GSR test was administered on defendant, when Berti identified defendant in a lineup, and when defendant underwent a buccal swab. On June 17, 2014, he executed a search warrant at Valerie's home which recovered a black t-shirt from the kitchen and a left-hand black glove from the bathroom.

¶ 18    The State entered a stipulation that Illinois State Police scientist Robert Berk analyzed defendant's GSR test and determined that defendant may not have discharged a firearm with either hand and that if he did, the particles were not deposited, not detected by the procedure, or removed by an activity, such as handwashing or the rubbing of hands on other surfaces.

¶ 19    The State further stipulated that assistant medical examiner Dr. Steven M. White performed an autopsy on Frank, recovered a bullet from the right chest cavity, observed gunshot wounds to Frank's back, left shoulder, and right forearm, and would testify that the cause of death was multiple gunshot wounds and the manner of death was homicide.

¶ 20    Forensic scientist Kelly Krajnik testified that she conducted DNA analysis on defendant's buccal swab. DNA analysis of the major male profile identified on the left-hand glove recovered in this case matched defendant and did not match Frank. No DNA was identified in the blood stain recovered from the right-hand glove, but defendant was included as a possible source of the DNA in the cellular material recovered from the right-hand glove.

¶ 21 The jury found defendant guilty of first degree murder during which he personally discharged a firearm. Trial counsel filed a motion and supplemental motion for judgment notwithstanding the verdict or in the alternative for a new trial.

¶ 22 On February 8, 2019, defendant told the court that he had some issues he wanted to address and that he asked counsel for "material" that was not provided. The court stated that counsel did not tender the material due to a supreme court order, and noted defendant had filed a *pro se* motion alleging ineffective assistance of counsel.

¶ 23 Defendant's *pro se* motion alleged that counsel did not allow him to decide whether the jury should be instructed on second degree murder, failed to admit hospital records to assert an "intoxication or drug defense," did not stipulate that defendant and Frank were "blood relative[s]," and that defendant was under the influence of a mind-altering drug at the time of the offense. The motion also complained that counsel failed to investigate the placement of a glove notwithstanding that defendant gave counsel a police report which contradicted the placement described by Stafford at trial, and that defendant believed the glove's placement was critical to the case. The motion asserted that counsel failed to present witnesses on defendant's behalf, thoroughly cross-examine the State's witnesses, object to the State's GSR stipulation and statement that GSR can be washed off with soap and water, and properly investigate the GSR evidence. The motion argued that counsel failed to file pretrial motions, subject the State's case to adversarial testing, and present a defense. The motion finally alleged that counsel advised defendant not to testify and the State failed to prove defendant discharged the firearm that caused Frank's death beyond a reasonable doubt.

¶ 24 On February 19, 2019, the trial court stated it would proceed with a *Krankel* hearing. However, defendant told the court that he was not ready because he had not yet received certain police reports and hospital records. The trial court asked trial counsel his "position," and counsel replied that he did not think he should have one. The court agreed and apologized. The court then asked defendant about his "big argument" of involuntary intoxication. Defendant replied that while involuntary intoxication was a "big part" of his arrest, it was not raised at trial.

¶ 25 The court then stated that although defendant was upset that trial counsel did not stipulate Frank was family member, several witnesses testified that defendant and Frank were cousins. Defendant next told the court he was not saying he "did it," but was also not saying he "didn't do it." He explained that if the case "came out like it should," the jury would have known that he did not know what happened. The court stated that defendant's motion raised irrelevant points, but he would be given time to obtain the materials he had requested.

¶ 26 On March 12, 2019, the trial court held a hearing on defendant's *pro se* motion. There, defendant argued that he did know if he committed the offense because he got high and did not know what happened after that, but he never had a firearm. However, defendant admitted he could "possibly" have done it. Relying on police reports obtained through the Freedom of Information Act, defendant argued that the State did not present the "responding officer" at trial and that this officer did not mention a glove. Defendant also argued that trial counsel told him there was "no such thing" as an "intoxication defense." The court asked trial counsel whether he told defendant there was no such thing as an involuntary intoxication defense. Counsel responded that he reviewed possible defenses, and while counsel did not remember if they discussed that particular defense, recalled discussing defendant's intoxication and the level "it was at." Counsel

never told defendant that he would present an intoxication defense and defendant never stated he wanted that defense.

¶ 27    Defendant then challenged the GSR stipulation because the State made its own "interpretation" that GSR could be washed off. The court replied that GSR could be washed off and that trial counsel stipulated that there was no GSR. Defendant next argued that counsel failed to cross-examine the State's DNA expert, which made it appear he killed Frank and "left the empty glove." The court replied no evidence showed who used the glove last and that defendant was the person who made that inference. Defendant also asserted that trial counsel lied by stating there was no intoxication defense, and advised him not to testify although defendant told counsel several times he wanted to testify. Upon questioning by the court, defendant admitted that the court told him that he was the only person who could decide whether he would testify, it was not trial counsel's decision, and he never told the court that he wanted to testify.

¶ 28    The court then asked if there was anything else, and defendant stated that he did not have the chance to take a "bench jury." The following exchange then took place:

> "THE COURT:  You never told me you wanted a bench trial.
>
> THE DEFENDANT:  You told me I have to take the jury.
>
> THE COURT:  I know that's not true.
>
> THE DEFENDANT:  Look at every record.
>
> THE COURT:  Whenever you—you initiated [*sic*] trial by jury every time. You wrote it on there every time, trial by jury.
>
> THE DEFENDANT:  I would have took a bench.

THE COURT: Okay. Anything else—are you saying you want a trial in front of me?

THE DEFENDANT: I would, yeah. 'Cause I'm looking at this, like, this 12 different people who don't know what's going on. At least you know the law."

¶ 29    The court concluded that defendant did not "come close to even indicating" that trial counsel was ineffective. In the court's opinion, defendant received excellent representation but did not like the outcome. Defendant disagreed, stating that trial counsel did not present a defense and rested without presenting a case. Ultimately, the court denied defendant's *Krankel* motion.

¶ 30    The court also denied defendant a new trial. After hearing argument, the court merged the two murder counts and sentenced defendant to 48 years in prison.

¶ 31    On appeal, defendant contends that the trial court failed to conduct an adequate preliminary *Krankel* inquiry into his claim that "counsel usurped" his decision whether to proceed to a bench or jury trial.

¶ 32    Pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984) and its progeny, when a defendant raises a *pro se* posttrial claim of ineffective assistance of counsel, the trial court is to examine the factual basis of the claim. *People v. Jolly*, 2014 IL 117142, ¶ 29. The purpose of the preliminary inquiry is to ascertain the underlying factual basis for the defendant's claim and to afford him the opportunity to explain and support that claim. *People v. Ayres*, 2017 IL 120071, ¶ 24; see also *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003).

¶ 33    The trial court may question trial counsel about the facts and circumstances surrounding the defendant's allegations, engage in a discussion with the defendant, or rely on its own knowledge of counsel's performance at trial and the insufficiency of the defendant's allegations.

*Ayres*, 2017 IL 120071, ¶ 12. If, after this preliminary inquiry, the trial court determines that the defendant's claim lacks merit or pertains only to matters of trial strategy, the court need not appoint new counsel and may deny the *pro se* motion. *Id.* ¶ 11. A claim lacks merit if it is conclusory, misleading, or legally immaterial, or does not bring to the trial court's attention a colorable claim of ineffective assistance of counsel. *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 71. If, however, the court finds that the allegations demonstrate "possible neglect of the case," new counsel must be appointed to represent the defendant at the hearing on the defendant's claim of ineffective assistance. *Moore*, 207 Ill. 2d at 78.

¶ 34 The applicable standard of review depends on whether the trial court determined the merits of the defendant's *pro se* posttrial claim of ineffective assistance of counsel. *People v. Jackson*, 2020 IL 124112, ¶ 98. Accordingly, if the reviewing court is asked to determine whether the trial court properly conducted a *Krankel* inquiry, the standard of review is *de novo*. *Id*. If, on the other hand, after performing the *Krankel* inquiry the trial court determines the merits of the defendant's ineffective assistance claim, the reviewing court may reverse only if the trial court's action was manifestly erroneous, *i.e*., the error was clearly evident, plain, and indisputable. *Id.*

¶ 35 In the case at bar, defendant contends that the trial court failed to conduct an adequate *Krankel* inquiry into his claim that trial counsel "usurped" his decision to have a bench trial or jury trial and to question trial counsel regarding this matter. We disagree.

¶ 36 Initially, we reiterate that the purpose of a preliminary *Krankel* inquiry is for the trial court to ascertain the underlying factual basis of the defendant's claims of ineffective assistance. See *Ayres*, 2017 IL 120071, ¶¶ 12-13, 24. The procedure at a preliminary *Krankel* inquiry "is somewhat flexible." *People v. Fields*, 2013 IL App (2d) 120945, ¶ 40. There is no requirement

- 11 -

that the court review each of the defendant's claims orally and memorialize them for the record or make express inquiries of trial counsel. See *Ayres*, 2017 IL 120071, ¶ 12. Rather, the court must simply "afford" the defendant an opportunity to explain and support his claims. See *id*. ¶ 24.

¶ 37     With these principles in mind, our *de novo* review reveals that the trial court conducted an adequate *Krankel* inquiry into defendant's claim that he was denied a bench trial. After defendant argued that he was not permitted to have a bench trial, the trial court stated that defendant never told the court that he wanted a bench trial. Defendant replied that the court told him he had to take a jury trial. The court stated this was not true and that the defense consistently requested a jury trial.

¶ 38     At the outset, we note that defendant never expressly claimed that he was denied effective assistance of trial counsel because counsel disregarded his desire to proceed by way of bench trial. While the trial court was permitted to question defendant about his claims during the preliminary *Krankel* inquiry (see *Jolly*, 2014 IL 117142, ¶ 30), there is no requirement that the court reframe defendant's complaint against the court as a complaint against counsel. To the extent that defendant argues this claim should be read as one alleging ineffective assistance of trial counsel because of the nature of the motion before the court, we disagree. During the hearing, defendant referred to trial counsel by his name and used the pronoun "he" when discussing counsel's complained-of actions and inactions. However, when discussing this specific claim, defendant addressed the trial court using the word "you," and the court responded by stating the defendant never told it that he wanted a bench trial.

¶ 39     Even reading the exchange between the trial court and defendant generously as a claim that trial counsel somehow denied him a bench trial, the inquiry itself was not inadequate. As discussed,

the trial court may base its conclusion at the preliminary inquiry on a "brief discussion between the trial court and the defendant," the trial court's own "knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face," or trial counsel's answers and explanations. *Moore*, 207 Ill. 2d at 78-79. Here, the trial court had a brief discussion with defendant and based its decision on this discussion, its own knowledge of the trial record, and the insufficiency of defendant's claim on its face.

¶ 40 Moreover, the court's inquiry was not deficient solely because the court did not question trial counsel about this issue. As our supreme court explained in *Moore*, the trial court may question trial counsel about a defendant's *pro se* claim, but there is no requirement that counsel be questioned during the preliminary *Krankel* hearing. While the court noted that "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any is warranted on a defendant's claim" (*Moore*, 207 Ill. 2d at 78), the court did not require that every *Krankel* inquiry include a discussion between trial counsel and the trial court. Rather, a trial court may rely on other bases for its determination. See *id*. at 78-79; *Ayres*, 2017 IL 120071, ¶ 12. Here, the trial court relied on its recollection, discussion with defendant, and the record to determine that defendant did not establish possible neglect of the case.

¶ 41 In the case at bar, the trial court conducted an adequate preliminary *Krankel* inquiry into defendant's claim that he was denied a bench trial when it inquired into the factual basis of the claim and afforded him ample "opportunity to explain and support his claim." *Ayres*, 2017 IL 120071, ¶ 24. Contrary to defendant's argument on appeal, he was permitted to argue that the court told him that he had to take a jury trial, a claim which the court considered and denied.

Accordingly, we find that the court conducted an adequate preliminary *Krankel* inquiry into this claim.

¶ 42 For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 43 Affirmed.