2023 IL App (2d) 220128
No. 2-22-0128
Opinion filed July 18, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 21-CF-386 |
| JOE D. FONTANEZ-MARRERO, | ) ) | Honorable George D. Strickland, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HUTCHINSON delivered the judgment of the court, with opinion
Presiding Justice McLaren and Justice Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Joe D. Fontanez-Marrero, was convicted of several offenses following his arrest for domestic battery by strangulation of his girlfriend, N.G. The trial court sentenced defendant to an aggregate five-year term, to be served at 85%. Defendant appeals and challenges his conviction and sentence. We affirm as modified.

¶ 2                          I. BACKGROUND

¶ 3    Defendant was charged with (1) aggravated domestic battery (family member) (720 ILCS 5/12-3.3(a-5) (West 2020)), (2) aggravated battery by knowingly causing bodily harm by strangulation (*id.* § 12-3.05(a)(5)), (3) aggravated battery (*id.* § 12-3.05(f)(1)), (4) aggravated unlawful restraint (*id.* § 10-3.1(a)), and (5) resisting a peace officer (*id.* § 31-1(a-7)). All charges

were based on the events of March 14, 2021. Counts I and II were based on the allegation that defendant knowingly strangled N.G. by applying pressure to her neck and thereby impeding her normal breathing. Count III alleged that defendant knowingly caused bodily harm to N.G. by pressing scissors against her body. Count IV alleged that, without legal authority, defendant knowingly used scissors, a deadly weapon, to detain N.G. inside her house. Count V alleged that defendant knowingly resisted Lake County sheriff's deputy Leonardo Juarez's arrest of him. The State filed notice that it would seek Class 1 felony sentences on counts I and II, based on defendant's use of a dangerous instrument, the scissors, during the offenses. See *id.* § 12-3.05(h)).

¶ 4    At trial, N.G. testified that, in March 2021, she, defendant, and her four dogs resided in the basement apartment of a house in Beach Park. Asked what happened between her and defendant on March 14, 2021, she testified that she did not recall. More specific questions brought the same answer. However, N.G. did acknowledge that she had a daughter, E.I., who often visited the apartment.

¶ 5    N.G. further testified that she and defendant resided in the apartment on October 28, 2019, but she could not recall whether they got into an argument, whether she called the sheriff's office, or whether she gave a statement to sheriff's deputies. At this point, the trial court ruled that, per section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1(a), (b), (c)(2)(A) (West 2020)), the court would allow the State to introduce N.G.'s prior taped and written statements as substantive evidence.

¶ 6    Juarez testified that, on March 12, 2021, he had contact with N.G., E.I., and defendant, but he did not elaborate. He further testified that, on March 14, 2021, he received a direct call from E.I. He was in uniform and drove a marked squad car to N.G.'s house. As Juarez drove up, he saw defendant walking from the rear of the house. When defendant saw Juarez, he took off running.

Juarez exited his car and pursued him. The chase was recorded on Juarez's body camera. Juarez called for defendant to stop, but defendant kept going, jumped over a wire fence, and discarded an object. Juarez followed and jumped over the fence but got caught in some thorns and became stuck. He received scratches and cuts on his knees. Later, he caught up to defendant, who tried to push him away. By this time, two other deputies were there, and defendant was subsequently secured in a squad car. Juarez and Lake County sheriff's sergeant Mike Kuvales found one half of a sharp pair of scissors on the ground. Later, Kuvales found the other half.

¶ 7    Juarez testified that he spoke to N.G. in the house. N.G. was scared, crying, and very emotional. Juarez asked her what had happened; her response was recorded on Juarez's body camera. On the video, N.G. told Juarez that defendant entered her house, put the scissors to her, and broke her phone. She continued, "[H]e was choking me [and] said that if the cops came he would kill me." She added that he held the scissors to her body and "kept kicking [her] and choking [her]."

¶ 8    Inside the house, Juarez took a written statement from N.G. In it, she stated as follows. Defendant entered with a "knife" in his hand. He broke her phone and then grabbed her and pointed the knife at her, threatening to kill her and her dogs. He "let one [dog] out to the street[ ] and let [the] others loose to fight." The statement continued:

> "[H]e grabbed me by my neck[,] pushed me into the kitchen[,] pinned me against the sink counter & fridge choking me and kicking my left leg[.] [I] was able to hold his [r]ight [h]and that held the knife he was trying to stab me with[.]"

¶ 9    Lake County sheriff's deputy Eli Streeter testified that, on March 14, 2021, he took several photographs depicting bruises on N.G.'s upper chest and lower neck and redness on her neck. The photographs were admitted into evidence.

¶ 10    E.I. testified that, on March 12, 2021, she, N.G., and defendant resided in the apartment. That day, she and N.G. were at home when defendant came in and got into an argument with N.G. E.I. got up to go to N.G.'s bedroom. Defendant followed her. E.I. told him to get out of her face. He went outside, returned soon after, approached E.I., and shoved her. N.G. got between them and told E.I. to call the police. She did. The police arrived a half hour later, but defendant was gone. That day, E.I. wrote a statement consistent with her later testimony.

¶ 11    E.I. testified that, on March 14, 2021, N.G. texted her. She texted back. Shortly afterward, she received a "butt call" from N.G. and heard her screaming, "[P]lease, please, don't hurt them[,]" and "[G]o get my dog." E.I. called the police. She drove to N.G.'s apartment, but the police did not let her in to see N.G. An hour later, E.I. saw N.G., who was crying and upset. The only injury to N.G. that E.I. noticed was some bruising on her side.

¶ 12    Bret Corless, a Beach Park paramedic, testified that, on March 14, 2021, he examined N.G., who was reportedly the victim of a potential battery. N.G. had tenderness and redness around her neckline, a small laceration on her left arm, and bruising on her right shin. In addition, N.G. told Corless that "she was choked, she had a sharp object held to her, and she was also on the ground when she had been kicked."

¶ 13    Lake County sheriff's deputy Wayne McCracken testified that, on October 29, 2019, he was dispatched to N.G.'s home. He saw that she had scabbing over her lip and on the right side of her face. In a statement, N.G. wrote that, on the previous evening, she and defendant got into an argument while he was in the bathroom. He came out, cursed at her, and hit her in the face with his phone, which split open her lip and bruised her eyebrow. Defendant then put his finger into his anus and smeared feces on her face. She left the house and went to the police station.

¶ 14    Kuvales testified that, on March 14, 2021, he was dispatched to N.G.'s home and spoke to her. Kuvales recorded the interview on his body camera. In part, it went as follows:

"KUVALES: When you said he put his hands around your neck, did you have trouble breathing? Was he like squeezing?

N.G.: Yeah, I mean between the fridge and the sink.

KUVALES: Okay. Did you ever lose consciousness? Did you ever feel like you were losing consciousness?

N.G.: No, he was just squeezing [puts hand around neck]."

Kuvales asked N.G. whether it had been "hard for [her] to breathe." She responded, "No, I could breathe, but it was just, you know how when you first start to squeeze and you feel pressure, that's it." She said she had been more worried about the "knife" defendant held in his right hand. The State rested. Defendant declined to present evidence.

¶ 15    After hearing arguments, the jury found defendant guilty of all charges. The trial court merged counts I and III into count II at sentencing. The parties agreed that, because count II, aggravated battery by strangulation, was a Class 1 felony, defendant was eligible for truth-in-sentencing, meaning he would serve 85% of his sentence. The court sentenced defendant to three concurrent five-year prison terms, with the term on count II to be served at 85%. The five-year term on count V, resisting arrest, was an extended-term sentence. Defendant made an oral motion for reconsideration of the sentence. The court denied the motion. This timely appeal followed.

¶ 16                                    II. ANALYSIS

¶ 17    On appeal, defendant contends that (1) he was not proved guilty beyond a reasonable doubt of count II, aggravated battery by strangulation; (2) the trial court erred in applying truth-in-sentencing to count II; and (3) the court erred in imposing the extended-term five-year sentence

on count V, resisting arrest. The State confesses error on the second contention and acknowledges that defendant was not subject to truth-in-sentencing on count II. The State contends that defendant was proved guilty of strangulation beyond a reasonable doubt and that the trial court did not err in imposing an extended-term sentence for resisting. We agree with the State on those points and affirm the judgment as modified.

¶ 18    Defendant first contends that the State did not prove him guilty beyond a reasonable doubt of count II, aggravated battery by strangulation. He notes that the State had to prove that he "intentionally imped[ed]" N.G.'s "normal breathing or circulation of the blood" by "applying pressure on [her] throat or neck." See 720 ILCS 5/12-3.05(a)(5), (i) (West 2020). Defendant argues that the State failed to prove that he actually impeded N.G.'s normal breathing. He cites N.G.'s statement to Kuvales that she never feared losing consciousness. He also notes that, when Kuvales asked her whether it had been "hard for [her] to breathe," she responded, "No, I could breathe," although she said she felt "pressure." The State responds that the jury properly credited N.G.'s numerous statements that defendant had "choked" or was "choking" her and that the jury reasonably concluded that these statements implied that the pressure defendant applied did impede N.G.'s normal breathing. For the reasons that follow, we agree with the State.

¶ 19    In addressing a challenge to the sufficiency of the evidence, we ask whether, after viewing the evidence in the light most favorable to the prosecution, any rational fact finder could have found the elements of the offense beyond a reasonable doubt. *People v. Baskerville*, 2012 IL 111056, ¶ 31. The trier of fact is responsible for deciding the weight to be given the witnesses' testimony, the credibility of the witnesses, and the reasonable inferences to be drawn from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006).

¶ 20    We conclude that the evidence was sufficient to prove that defendant strangled N.G. It is undisputed that defendant applied pressure to her neck with his hands. N.G. so demonstrated to Kuvales, and both the photographs and Corless's observations allowed the jury to conclude that the pressure was severe enough to cause noticeable discoloration.

¶ 21    More important, in describing defendant's act, N.G. repeatedly used some form of the verb "choke." She told Juarez that defendant "choked" her. In her written statement, she stated that defendant was "choking" her. Corless testified that N.G. told him that defendant had "choked" her. Although N.G. did not say "choke" when she spoke to Kuvales, any inconsistency arising from this omission created a question for the jury to resolve. See *id.* We cannot say from this evidence that the jury's verdict was unreasonable or contrary to the weight of the evidence.

¶ 22    Defendant asserts that "choke" does not necessarily imply any impediment to normal breathing. We disagree, but that is beside the point. The ordinary definition of "choke" is "to check or block normal breathing of by compressing or obstructing the trachea." Merriam-Webster's Collegiate Dictionary 201 (10th ed. 1993). The jury reasonably inferred that, when N.G. repeatedly used a form of the verb "choke," she intended it to convey its plain and customary meaning— equivalent to the statutory definition of "strangulation": *i.e.* he intentionally impeded her normal breathing. See 720 ILCS 5/12-3.05(i) (West 2020). Therefore, we determine that defendant was proved guilty beyond a reasonable doubt of count II.

¶ 23    Defendant's second contention is that the trial court erred in applying truth-in-sentencing to his five-year prison term on count II, aggravated battery by strangulation. He recognizes that he did not raise this claim at the trial level but contends that the failure resulted from his counsel's ineffectiveness. The State concedes the ineffective-assistance claim. We agree with the parties that counsel's failure to raise this meritorious issue was ineffective assistance.

¶ 24    To establish ineffective assistance of counsel, a defendant must show (1) objectively unreasonable performance by counsel and (2) prejudice from that deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). Here, counsel acquiesced in the trial court's conclusion that truth-in-sentencing applied to defendant's conviction of aggravated battery by strangulation. However, as the parties agree, subsection (a)(2.1) of section 3-6-3 of the Unified Code of Corrections (Code) (730 ILCS 5/3-6-3(a)(2.1) (West 2020)) requires day-for-day sentencing credit for all offenses not specifically excepted elsewhere in section 3-6-3. Section 3-6-3 does not subject aggravated battery by strangulation to a 15% sentencing credit. Thus, counsel's failure to contest the application of truth-in-sentencing to defendant's sentence on count II was unreasonable and prejudicial. See *People v. Loggins*, 2019 IL App (1st) 160482, ¶ 127.

¶ 25    Additionally, the trial court imposed a four-year term of mandatory supervised release (MSR) on the conviction of count II. The State notes that the proper MSR term for a Class 1 offense is two years. See 730 ILCS 5/5-4.5-30(*l*) (West 2020). Therefore, we modify the judgment to state that defendant shall receive day-for-day sentencing credit on count II and that the MSR term for count II is two years.

¶ 26    Defendant's final contention is that the trial court erred in imposing an extended-term sentence on his conviction of resisting a peace officer. He relies on section 5-8-2(a) of the Code (*id.* § 5-8-2(a)), which allows an extended-term sentence only for "the class of the most serious offense of which the offender was convicted" and then *only if* certain aggravating factors are found. Defendant does not dispute that those factors were present here. Rather, he argues only that the Class 4 felony of resisting a peace officer was not the most serious offense of which he was convicted.

¶ 27    Defendant concedes that this claim of error is forfeited because he did not raise it in the trial court. See *People v. Allen*, 222 Ill. 2d 340, 350 (2006). Nevertheless, he requests that we address the claim under the plain-error rule because the court's misapplication of law affected a substantial right. See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967); *People v. Myrieckes*, 315 Ill. App. 3d 478, 483 (2000). The State responds that defendant cannot satisfy the first step in plain-error analysis, which is to establish that "a clear or obvious error occurred" (*People v. Jackson*, 2022 IL 127256, ¶ 21).  For the reasons that follow, we agree with the State.

¶ 28    As defendant acknowledges, there is an exception under which an extended-term sentence may be imposed for a lesser offense. Specifically, extended-term sentences may be imposed "on separately charged, differing class offenses that arise from *unrelated* courses of conduct regardless of whether the cases are separately prosecuted or consolidated." (Emphasis added.) *People v. Coleman*, 166 Ill. 2d 247, 257 (1995). "[W]hether a defendant's multiple offenses are part of an 'unrelated course of conduct' for the purposes of his eligibility for an extended-term sentence" depends on "whether there was a substantial change in the nature of the defendant's criminal objective." *People v. Bell*, 196 Ill. 2d 343, 354 (2001). In turn, whether two offenses are part of the same course of conduct depends on "whether the acts constituting each crime were independently motivated or whether each was part of a course of conduct guided by an overarching criminal objective." (Internal quotation marks omitted.) *People v. Hummel*, 352 Ill. App. 3d 269, 271 (2004). This definition of "course of conduct" is the same one formerly used to determine a defendant's eligibility for consecutive sentences under section 5-8-4(a)(i) of the Code (see 730 ILCS 5/5-8-4(a)(i) (West 2000)).

¶ 29    Here, the trial court found that defendant's conduct in attempting to elude Juarez was unrelated to his earlier battering and unlawfully restraining N.G. in the house. We may not disturb

this finding unless it is against the manifest weight of the evidence. *Hummel*, 352 Ill. App. 3d at 271.

¶ 30    Defendant relies on *People v. Arrington*, 297 Ill. App. 3d 1 (1998), and *People v. Robinson*, 2015 IL App (1st) 130837. In *Arrington*, 297 Ill. App. 3d at 2, the defendant entered a supermarket and used a replica pistol to force a clerk to hand over money. As the defendant turned to leave, a manager ordered him to stop and tried to block his path. *Id.* The defendant hit the manager with the replica pistol and was eventually subdued inside the store. *Id.* After a jury trial, he was convicted of attempted robbery and aggravated battery. *Id.* Based on its finding that the two offenses were not committed as parts of a single course of conduct, the trial court imposed consecutive sentences. *Id.* at 3.

¶ 31    On appeal, we held that the trial court erred in imposing consecutive sentences, and we modified the judgment to make the sentences concurrent. *Id.* at 6. We explained that the offenses were parts of a single course of conduct, because the defendant's objective was to rob the store, and "inherent in any plan to rob a store is also an intention for the robber to escape from the premises with the purloined proceeds." *Id.* at 5. Thus, the battery to the manager was "an attempt to complete [the defendant's] original plan, namely the robbery of and escape from the store." *Id.*

¶ 32    In *Robinson*, 2015 IL App (1st) 130837, ¶¶ 1, 11, the defendant entered another's apartment. The resident arrived home and caught the defendant trying to steal a television set. The resident blocked the doorway. *Id.* ¶ 11. The defendant ran at him, and the two men got into a lengthy fight in which the defendant bit off the resident's lower lip. *Id.* ¶ 11. After a bench trial, the defendant was convicted of residential burglary and aggravated battery. *Id.* ¶¶ 1, 27. The trial court sentenced the defendant as a Class X offender to 30 years' imprisonment for residential

burglary and to an extended-term sentence of seven years for aggravated battery, with the sentences to run concurrently. *Id.* ¶¶ 41-42.

¶ 33    On appeal, the court held in part that the extended-term sentence for aggravated battery was improper, because the two offenses were part of a single course of conduct. *Id.* ¶ 45. Following *Arrington*, the court explained that "a burglar who is attempting not to be detected maintains a constant objective to escape throughout the burglary, regardless of how he or she may have to effectuate that escape." *Id.* ¶ 107. Thus, because escape was an inherent part of the defendant's original plan and the attack on the resident was solely a means "to finish what [the defendant] had started," the attack had no objective independent of the original plan. *Id.* ¶ 108.

¶ 34    Here, we agree with the State that defendant's attempt to elude Juarez was a separate course of conduct from battering and detaining N.G. As the State notes, the objective of the earlier offenses was to terrorize N.G. That purpose was fully accomplished when defendant committed the acts inside the house. Unlike the robber's flight from the store in *Arrington*, or the burglar's flight from the premises in *Robinson*, defendant's flight from Juarez was not necessary to effectuate his purpose—namely, to undertake violent acts against a separate person in a different location. Thus, the trial court did not err in finding that the flight was a separate course of conduct from strangling and forcibly detaining N.G. and that it subjected defendant to extended-term sentencing. Therefore, we affirm defendant's extended-term sentence for resisting a peace officer, as it was a separate course of conduct.

¶ 35                                    III. CONCLUSION

¶ 36    For the reasons stated, we modify the judgment to reflect that defendant is eligible for day-to-day credit on his sentence on count II for aggravated battery by strangulation and that the MSR

term for that sentence is two years. In all other respects, we affirm the judgment of the circuit court

of Lake County.

¶ 37    Affirmed as modified.

*People v. Fontanez-Marrero*, **2023 IL App (2d) 220128**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 21-CF-386; the Hon. George D. Strickland, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Zachary Wallace, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Katherine M. Doersch and Jalan L. Jaskot, Assistant Attorneys General, of counsel), for the People. |